William E. GROSECLOSE,
Petitioner–Appellee,

v.

Ricky BELL, Warden, Respondent–
Appellant.

No. 95–6262.

United States Court of Appeals,
Sixth Circuit.

Argued April 24, 1997.

Decided Dec. 2, 1997.

Larry D. Woods (argued and briefed), Woods & Woods, Nashville, TN, for Petitioner–Appellee.

Gordon W. Smith, Asst. Attorney Gen. (argued and briefed), Glenn R. Pruden (briefed), Office of the Attorney General, Criminal Justice Division, Michael E. Moore (briefed), Office of the Attorney General, Nashville, TN, for Respondent–Appellant.

Before: KEITH, RYAN, and SUHRHEINRICH, Circuit Judges.

RYAN, J., delivered the opinion of the court, in which KEITH, J., joined. SUHRHEINRICH, J. (pp. 1171–1179), delivered a separate dissenting opinion.

RYAN, Circuit Judge.

Ricky Bell, the warden of the Tennessee Riverbend Maximum Security Institution and the respondent in these proceedings, appeals from the district court's judgment granting a writ of *habeas corpus* to petitioner William E. Groseclose pursuant to 28 U.S.C. § 2254. Although the State of Tennessee presents numerous allegations of error with respect to the various bases for the district court's issuance of the writ, we find only one issue necessary to the resolution of this appeal. Because we conclude that the district court correctly found that Groseclose was unconstitutionally denied effective assistance of counsel under the Sixth Amendment, we will affirm.

## I.

### A.

In February 1978, William E. Groseclose was convicted in the Shelly County, Tennessee, Circuit Court of murder in the first degree in connection with the killing of his wife, Deborah Lee Groseclose, on June 29, 1977. Groseclose was alleged to have contacted Barton Wayne Mount, a naval recruit Groseclose met while Groseclose was employed in the Navy Recruiting Service, in an effort to find someone to murder Mrs. Groseclose. *State v. Groseclose,* 615 S.W.2d 142, 144 (Tenn.1981). Mount referred Groseclose to an acquaintance, Phillip Michael Britt, who in turn contacted Ronald Eugene Rickman, Britt's former brother-in-law. Rickman agreed to commit the murder in cooperation with Britt. Groseclose agreed to pay a certain price, in which Rickman, Britt, and Mount would all share. During its prosecution of the case, the State never ascribed one particular motive to Groseclose, but instead pointed to evidence that "[h]is motives may have been apprehension that [his wife] was about to sue him for divorce, desire to obtain [substantial] life insurance proceeds, or interest in another woman." *Id.*

The Tennessee Supreme Court described the murder as "one of the most atrocious and inhuman conceivable." *Id.* at 145. According to the evidence presented by the State at trial, the scheme was for Rickman to accost Deborah the day before the murder and, in an attempt to divert suspicion for the later murder from her husband, "to frighten her to the point that she would report ... the incident to the police." *Id.* The next morning, Groseclose left his house with the couple's infant son, leaving the back door unlocked. Rickman and Britt then entered the house; each raped Deborah Groseclose, and then told her "there was a 'contract' on her life." *Id.*

After listening to Deborah plead for her life by offering money to her assailants, Rickman "proceeded to strangle Mrs. Groseclose into unconsciousness," and then, because he detected a pulse, to stab her three or four times in the back. *Id.* Rickman and Britt placed Deborah in the trunk of her car, apparently believing her to be dead, "and drove the vehicle to a parking lot adjacent to the main Memphis Public Library." *Id.* During the trip, Rickman learned that she was not in fact dead because he "could hear her cries for help from the trunk." *Id.* Rickman and Britt nonetheless left her in the trunk of her car; she was discovered five days later, and the medical testimony at trial suggested that while she would not have died from her injuries alone, the excessive heat in her car trunk caused her death.

During the subsequent investigation, police were led to Rickman and Mount through information given by Rickman's roommate. Although Rickman, Britt, and Mount all gave statements to the police, Groseclose did not. Groseclose, Rickman, and Britt were all charged with murder in the first degree, tried jointly, and convicted.

### B.

Jury selection began on February 13, 1978, and was completed on February 17. Groseclose, along with Rickman and Britt, pleaded not guilty. The trial began on February 18 and was concluded on February 28. The sentencing hearing was held between March 1 and March 3. The State presented 39 witnesses during the guilt phase of the trial. None of the defendants testified during the guilt phase. All three defendants were convicted of murder in the first degree. Groseclose and Rickman were then sentenced to death, while Britt received a sentence of life imprisonment.

Groseclose appealed to the Tennessee Supreme Court, which affirmed his conviction in 1981. *Groseclose,* 615 S.W.2d 142. The U.S. Supreme Court then denied Groseclose's petition for writ of *certiorari. Groseclose v. Tennessee,* 454 U.S. 882, 102 S.Ct. 366, 70 L.Ed.2d 193 (1981). Groseclose next filed a petition for post-conviction relief in January 1982, arguing, *inter alia,* that he had received constitutionally ineffective assistance of counsel. After holding an evidentiary hearing, the trial court denied the petition in December 1982. The Court of Criminal Appeals affirmed the denial in February 1984. *Groseclose v. Tennessee,* No. 9 (Tenn. Crim.App. Feb. 16, 1984). The Supreme Court of Tennessee denied a subsequent application for permission to appeal, and the U.S. Supreme Court denied a petition for writ of *certiorari. Groseclose v. Tennessee,* 469 U.S. 1066, 105 S.Ct. 549, 83 L.Ed.2d 436 (1984).

Groseclose filed a second and third petition for post-conviction relief in the state court, both of which proceeded through the system and were denied. Groseclose also filed a petition for a state writ of *habeas corpus,* which was denied.

Groseclose filed his petition for writ of *habeas corpus* in the U.S. District Court for the Middle District of Tennessee in August 1989. In February and November 1990, the State filed two motions for judgment on the pleadings, alleging that Groseclose had procedurally defaulted on several of his claims. In November 1994, the district court denied these motions. In January 1995, Groseclose filed a motion for summary judgment as to some of his claims. The district court granted summary judgment with respect to many of Groseclose's claims, but denied it with respect to others, instead granting it, *sua sponte,* to the State. Groseclose has not filed an appeal from those latter rulings, and they are not at issue.

On April 10, 1995, the district court conducted an evidentiary hearing on Groseclose's claims that remained following the summary judgment disposition, and in due course, issued an order directing that a writ issue unless the State afforded Groseclose a new trial within 120 days. *Groseclose v. Bell,* 895 F.Supp. 935 (M.D.Tenn.1995). The court based its granting the writ on the constitutionally ineffective assistance of Groseclose's trial counsel, and, as an alternative basis, on the cumulative effect of the errors for which the court had earlier granted summary judgment. The court declined to reach, however, an argument by Groseclose that the Shelby County Circuit Court systematically discriminated against blacks and women in the selection of grand jury foremen.

The State filed a motion to alter or amend the judgment, pursuant to Fed.R.Civ.P. 59, which was denied by the district court in August 1995, and then filed this timely appeal. The district court stayed its judgment pending this appeal.

### II.

■■■ This court reviews *de novo* a district court's disposition of a petition for writ of *habeas corpus,* but nonetheless reviews the district court's factual findings only for clear error. *See McQueen v. Scroggy,* 99 F.3d 1302, 1310 (6th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2422, 138 L.Ed.2d 185 (1997). Further, federal courts must defer to state court factual findings, according a presumption of correctness that the petitioner may rebut only with clear and

convincing evidence. *Id.* "The presumption ... applies to implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility." *Id.* However, "[t]he presumption only applies to basic, primary facts, and not to mixed questions of law and fact," which receive *de novo* review. *Id.*

▮ An ineffective assistance of counsel claim presents a mixed question of law and fact, for which both the state-court and district-court determinations are subject to *de novo* review by this court. *See Sims v. Livesay,* 970 F.2d 1575, 1579 (6th Cir.1992); *Smith v. Jago,* 888 F.2d 399, 407 (6th Cir. 1989).

> [I]n a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d). Ineffectiveness is not a question of "basic, primary, or historical fac[t.]" Rather, ... it is a mixed question of law and fact. Although state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254(d), and although district court findings are subject to the clearly erroneous standard of Federal Rule of Civil Procedure 52(a), both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.

*Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984) (citations omitted); *accord McQueen,* 99 F.3d at 1310–11.

In setting forth this applicable standard of review, we take note of the disagreement expressed in the parties' briefs as to the effect of the recent amendments to 28 U.S.C. § 2254 set forth in section 104 of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104–132, 110 Stat. 1214 (1996). Although the AEDPA became effective on April 24, 1996, and although it mandates significant changes to the federal courts' treatment of both factual and legal issues in the *habeas* setting, the Supreme Court's recent decision in *Lindh v. Murphy,* —— U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), instructs that those changes do not apply to this case, or any case pending at the time of the AEDPA's enactment; instead, those changes "generally apply only to cases filed after the Act became effective." *Id.* at ——, 117 S.Ct. at 2068. We are, instead, left to apply section 2254(d) as it existed prior to enactment of the AEDPA. *See id.*

## III.

### A.

#### 1.

Groseclose's contention that his privately retained trial counsel, Fernand D. Brackstone, had been constitutionally ineffective was initially raised by Groseclose at the time of his first post-conviction proceeding. According to representations made by the State in this appeal, Groseclose based his contention that Brackstone was ineffective on ten separate grounds: (1) the failure of Brackstone to keep Groseclose adequately advised; (2) his failure to investigate and prepare a defense; (3) his failure to file appropriate pretrial motions; (4) his failure to make timely and necessary objections; (5) his failure to conduct appropriate jury *voir dire;* (6) his failure to call witnesses to impeach prosecution witnesses although requested to do so by Groseclose; (7) his failure to independently represent Groseclose, instead following the lead of Rickman's attorney; (8) his failure to make proper inquiry concerning Groseclose's State-administered medication at trial; (9) his failure to properly communicate with Groseclose after trial; and (10) his failure to request appropriate jury instructions.

The state courts rejected Groseclose's arguments. In formulating its denial, the state trial court explicitly based its findings on "the transcript of th[e] [post-conviction] hearing as well as the trial transcript, pleadings and ... its own memory as to what transpired during the course of the trial." The court then wrote as follows:

> (2) The Court finds that the attorney of record, Mr. Fernand D. Brackstone, met the legal standard of effective representation in [sic] behalf of the petitioner as required in Tennessee. The alleged failure of Mr. Brackstone to exhaust his peremptory challenges during voir dire does

not constitute ineffective assistance. The transcript of the voir dire reveals there was an abundance of information available to Mr. Brackstone to make a proper decision on the qualifications of the prospective jurors. Mr. Brackstone commencing in volume five joins Mr. Adams[, counsel for codefendant Britt,] in objecting to the exclusion of certain jurors by the Court on their views as to considering the death penalty.

(3) The Court finds that Mr. Brackstone in interviewing the petitioner attempted to substantiate the petitioner's position that he was not present during the murder.

. . . .

(5) The Court finds that Mr. Brackstone did not completely turn over the representation of his client to Mr. Robert I. Livingston[, counsel for codefendant Rickman]. Commencing on the second day of the voir dire . . ., the attorneys for all three defendants agreed to work as a team for the benefit of all parties. This continued during the course of the trial.

(6) The Court finds that Mr. Brackstone's representation was not incompetent due to a failure to produce any proof during the guilt phase of the trial. Rather at the close of the State's proof the attorneys agreed to not produce any proof. The petitioner testified in the absence of the jury after a consultation with his fellow codefendants, their attorneys, and his counsel, Mr. Brackstone, he did not desire to testify in his own behalf. This is set out in the trial transcript.

(7) The Court finds that Mr. Brackstone did produce witnesses during the penalty phase, that is those witnesses who knew of the petitioner's whereabouts on June 29, 1977, his work associates and service record. . . . There was evidence produced on the petitioner's part that he had no criminal record. . . .

(8) The Court finds no merit to the allegation that Mr. Brackstone rendered the petitioner ineffective assistance during the appellate stage not withstanding [sic] the fact that Mr. Brackstone lost his trial notes.

(9) The Court finds that Mr. Brackstone did[,] after numerous discussions with the petitioner, conduct an investigation of the petitioner's case. This was done by talking to state witnesses, petitioner's neighbors, visiting the petitioner's home and crime scene, reviewing the State's physical evidence, talking to the co-defendants and the petitioner's co-employees.

(10) The Court finds that Mr. Brackstone has been practicing law since 1937, primarily in a general practice. There was a hiatus between 1956 and 1971 while he was in the mercantile business in Mississippi; that he had made himself aware of legal procedure and legal issues in murder cases.

Based on these findings, the trial court concluded that Brackstone "has met the standard of competence as required by [Tennessee law]: 'Whether the advise [sic] given, or the services rendered by an attorney are within the range of competence demanded by attorneys in criminal cases.'" (Citation omitted.) The appellate court affirmed the trial court's judgment, making no additional findings of significance.

In addressing Groseclose's claim, the district court made extensive findings, which in large measure we will repeat here. We note that none of the district court's findings of primary fact is in any measure inconsistent with the state courts' findings. Instead, the district court simply addressed facts not focused on by the state courts, which focus in turn led the district court to a different legal conclusion. We note that the district court's findings, in addition to being wholly consistent with the state courts' findings, are amply supported by the record. Indeed, the State does not argue that the findings in question are clearly erroneous. The district court found, as follows:

Brackstone graduated from law school in 1937, and practiced in Mississippi until 1941; after World War II, he worked for the Veterans Administration until 1950; between 1950 and 1956, he operated a business while practicing law part-time; between 1956 and 1971, he did not practice law at all while he operated another business; and between 1971, when he again began practicing law, and Groseclose's trial in 1977, Brackstone had four to six criminal jury trials, none of which was a murder trial. Indeed, before Grosec-

lose's case, Brackstone had never had a murder case that went to a jury. And between his return to practice in 1971 and Groseclose's trial in 1977, Brackstone attended a total of three or four legal seminars, only one part of one of which dealt with defending murder cases.

Brackstone "never said and never reported [to Groseclose] what he investigated or what his results were" during pretrial investigation, and told "Groseclose that he should just plead guilty and throw himself on the mercy of the court." Brackstone never described to Groseclose the nature of the State's evidence against him. Brackstone almost entirely failed to investigate the case; he never, for example, interviewed the crime-incident witnesses or any family members.

Brackstone failed to develop a defense theory. When questioned at the state postconviction hearing regarding his theory of the case, Brackstone's only response was, "My theory was to do the best I could with what I had." He explained that "attacking the story of Rickman and Britt was not part of his theory of defense." Thus, he testified, he did not consider mounting "a defense of blaming co-defendants Rickman and Britt who for reasons known only to them had decided to implicate Mr. Groseclose into the murder conspiracy by fabricating his involvement." During the guilt phase of the trial, Brackstone failed to call a single witness or put on any proof, and, further, advised Groseclose not to testify, despite his lack of a criminal record and despite the fact that he had consistently maintained his innocence. Brackstone made one independent objection in the course of the 2400–page transcript. He cross-examined fewer than half of the State's 39 witnesses; his cross-examination of Mount, perhaps the most crucial witness for the State, consisted of a total of 11 pages of transcript. And after failing to present the jury with any evidence on his client's behalf, Brackstone culminated his performance by waiving his closing argument.

When asked during the federal evidentiary hearing whether he thought Brackstone was "effective" or "competent," the attorney for codefendant Britt—who testified for the *State* as an expert witness—responded, "[N]o[,] he was not effective." According to Britt's attorney, "Brackstone was more or less doing what [Rickman's attorney] did to represent his client. He was kind of following [Rickman's attorney's] lead." And as Groseclose's expert witness pointed out, this course was especially ill-judged because "there was no reasonable possibility of a unified defense," given the disparity, indeed hostility, between the parties' interests.

According to Britt's attorney, Brackstone failed to prepare at all for the presentation of mitigation evidence during the sentencing stage of the proceedings. Indeed, Brackstone called only four mitigation witnesses. Moreover, he waived his opening statement—a decision that Groseclose's expert witness in this *habeas* proceeding termed "remarkable." He failed to introduce Groseclose's fairly impressive military record, and failed to present witnesses concerning Groseclose's extensive religious and volunteer activities, despite Groseclose's suggestions and despite the witnesses' ready availability. He failed to call any experts who could have testified about sociological and psychological factors. And while he did opt to make a closing argument during this stage of the proceedings, it occupied all of nine minutes.

Based on these findings, the district court concluded that Brackstone's performance was deficient in many respects, and that the "deficiencies prejudiced the defense so as to deprive the defendant of a fair trial." The court concluded, alternatively, that Brackstone's performance was so deficient—in that it failed to subject the prosecution's case to meaningful adversarial testing—that it was unnecessary to demonstrate prejudice.

### 2.

With any ineffective-assistance claim, the obvious starting point is *Strickland,* in which the Court "consider[ed] the proper standards for judging a criminal defendant's contention that the Constitution requires a conviction or death sentence to be set aside because counsel's assistance at the trial or sentencing was ineffective." 466 U.S. at 671, 104 S.Ct. at 2056. Never before *Strickland* had the Court "directly and fully addressed a claim of 'actual ineffectiveness' of counsel's assistance in a case going to trial." *Id.* at 683, 104 S.Ct.

at 2062. Nonetheless, the Court's recognition "that the Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial," may be observed "[i]n a long line of cases" dating as far back as 1932. *Id.* at 684, 104 S.Ct. at 2063. As the Court explained,

> a fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding. The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the "ample opportunity to meet the case of the prosecution" to which they are entitled.

*Id.* at 685, 104 S.Ct. at 2063.

A defendant may be deprived of his right to effective assistance of counsel when his attorney has "simply ... fail[ed] to render 'adequate legal assistance.'" *Id.* at 686, 104 S.Ct. at 2064. According to the *Strickland* Court, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* This standard is equally "appli[cable] to a capital sentencing proceeding," as it "is sufficiently like a trial in its adversarial format and in the existence of standards for decision, that counsel's role in the proceeding is comparable to counsel's role at trial." *Id.* at 686–87, 104 S.Ct. at 2064 (citations omitted).

The *Strickland* Court established a two-part test:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Un-

less a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. at 2064. The first prong of this test—the showing of deficient performance—is an objective one: "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness," as judged simply by "prevailing professional norms." *Id.* at 687–88, 104 S.Ct. at 2064–65; *accord Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn.1975).

The Court cautioned that in undertaking an ineffective-assistance review, "[j]udicial scrutiny of counsel's performance must be highly deferential," and must avoid the "second-guess[ing of] counsel's assistance ...," [as] it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. In order to avoid "the distorting effects of hindsight," a reviewing "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that ... the challenged action 'might be considered sound trial strategy.'" *Id.* (citation omitted). And in considering whether an action, including a failure to investigate, is a strategic decision, one must consider the effect of information conveyed by the defendant to his counsel.

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be

directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Id.* at 690–91, 104 S.Ct. at 2066.

After these explanations, the *Strickland* Court turned to a consideration of the second, "prejudice" prong of its test, noting that even professionally unreasonable errors do "not warrant setting aside the judgment of a criminal proceeding if the error[s] had no effect on the judgment." *Id.* at 691, 104 S.Ct. at 2066. *But see United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Except in certain limited circumstances, "ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." *Strickland,* 466 U.S. at 693, 104 S.Ct. at 2067. To do so, the Court explained,

[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding. . . .

On the other hand, we believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case. . . .

. . . .

. . . [T]he appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution, and in the test for materiality of testimony made unavailable to the defense by Government deportation of a witness. *The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.*

*Id.* at 693–94, 104 S.Ct. at 2067–68 (emphasis added) (citations omitted).

The Court then explained how to apply this general standard to specific circumstances:

The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors. *When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer*—including an appellate court, to the extent it independently reweighs the evidence—*would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.*

*Id.* at 695, 104 S.Ct. at 2069 (emphasis added).

### 3.

■ In assessing whether Groseclose was unconstitutionally deprived of the effective assistance of counsel, in the constitutional sense, we turn first to the State's contentions on appeal. The State's challenges to the district court's conclusions, however, are notably sparse. It argues, first, that the district court erroneously ignored the presumption of correctness to be accorded to state-court findings, and essentially performed a *de novo* review of the case. Without pointing to a single factual finding of the state court

that was ignored by the district court, the State argues that the underlying findings should have been presumed to be correct, and that if this presumption were applied, it would be clear that Groseclose failed to prove his counsel's performance was prejudicially defective. As we have already observed, however, there is no state-court finding of historical fact that is inconsistent with the district court's findings, and there were no state-court findings that were inappropriately ignored by the district court. And since the ultimate questions of the adequacy of counsel's performance and prejudice to the petitioner are mixed questions of law and fact, not subject to clearly erroneous review, we are constrained to conclude that this part of the State's argument fails.

The State's second argument is a rather unclear procedural-default claim: that, in state court, Groseclose raised "only" ten specific arguments in connection with his ineffective-assistance claim, and that the state court rejected all those claims, "either explicitly or implicitly." The State then argues that Groseclose is now limited to the claims that he raised in state court—yet the State does not specify which of the arguments Groseclose raised in the district court, or which of the legal bases relied on by the district court, it believes are now barred from consideration. We have no difficulty in concluding that this procedural-default contention is completely lacking in merit. Our review of the record reveals that the arguments that the State acknowledges were preserved in the state court are precisely those that Groseclose relied on in federal court.

### 4.

Strangely, the State has failed to offer any substantive challenge to the district court's issuance of the writ on the ground of ineffective assistance. Conducting our own *de novo* review, we are satisfied that the district court's action was correct. That is, as we shall explain, we have absolutely no hesitation in concluding that Brackstone's performance was objectively unreasonable and well below the minimum standards of professional competence, and that competent representation may well have garnered a different outcome. Given the record in this case, it is perhaps unsurprising that the

State does not present a more vigorous challenge to the district court's conclusion.

This is not to say, however, that Groseclose's arguments are uniformly well-taken. In arguing Brackstone's ineffectiveness, Groseclose mistakenly tends to focus upon perceived shortcomings that may arguably be attributable to trial strategy, such as Brackstone's failure to call certain family members as witnesses during the guilt phase or the failure to file various pretrial motions. A better advocate may very well have done these things, but that is not the constitutional standard to which an attorney is held under *Strickland*. In addition, some of the arguments Groseclose makes are simply not reliable bases for concluding that Brackstone was ineffective, such as Groseclose's claims that Brackstone did not understand the nature of the trial, and erroneously thought it was a bifurcated proceeding.

Turning now to an assessment of Brackstone's representation of Groseclose in light of the requirements of *Strickland,* we begin first with the so-called *performance* prong of *Strickland.* As the *Strickland* Court stated, "[t]hat a person who happens to be a lawyer is present at trial alongside the accused ... is not enough to satisfy the constitutional command." *Strickland,* 466 U.S. at 685, 104 S.Ct. at 2063. Brackstone was, at best, "a person who happens to be a lawyer." In reaching this conclusion, we find three aspects of Brackstone's representation in this capital case to be especially appalling: (1) his failure to have any defense theory whatsoever; (2) his failure to conduct any meaningful adversarial challenge, as shown by his failure to cross-examine more than half of the prosecution's witnesses, to object to any evidence, to put on any defense witnesses, to make a closing argument, and, at sentencing, to put on any meaningful mitigation evidence; and (3) perhaps most importantly, his abdication of his client's case to Rickman's counsel. Also significant, as noted by the *Strickland* Court, was Brackstone's failure to adequately communicate with Groseclose prior to trial.

While the justification for our conclusion that the first and second failures listed above amounted to an ineffective performance is presumably self-evident, our third criticism

merits a fuller explanation. Certainly, there are cases in which defense counsel for one defendant may defer to counsel for another defendant, allowing that attorney to act as lead counsel. But in this case, Rickman's defense was completely antagonistic to Groseclose's defense. This was a case in which a competent defense attorney would wish for severance. Rickman had confessed and implicated Groseclose. Groseclose, on the other hand, had never made any inculpatory statement to police, and there was little evidence tying him to the crime beyond the statements of his coconspirators. Thus, to align Groseclose's defense with that of Rickman and then to yield the adversarial lead to Rickman's counsel, given the necessary antagonism, is, to use the current vernacular, mind-boggling.

But Brackstone's decision to simply follow the lead of Rickman's court-appointed counsel was an exceptionally egregious decision for Groseclose's fortunes, given the extraordinary tactics employed by that gentleman. First, Rickman's attorney was not a model of preparation. Indeed, he testified during the *habeas* proceeding in the district court that because he believed there was no defense available during the guilt phase of Rickman's trial, he simply failed to prepare for trial. He did not interview any witnesses, conduct any legal research, or obtain and review any records. Second, in what the state court described as a "desperate" strategy, Rickman's attorney decided that his client's best hope was in being portrayed as "subnormal." His defense strategy, therefore, was to attempt "to show the jury that we had a sick boy on trial, a subnormal, abnormal human being on trial.... That was my whole object of the whole defense, was [to] try to convince the jury that we had a sick man on trial." To that end, he had Rickman testify about past violent crimes and drug use, and, in general, repeatedly elicited testimony that portrayed Rickman in a deviant, destructive, and terrifying light. It is difficult to imagine anything more ill-considered than a decision to hitch Groseclose's wagon to that star; there is no conceivable way that the line of defense followed by Rickman's attorney could do anything but further damage Groseclose in ways that a defense tailored to Groseclose would not have done.

We note, too, that there is no conceivable way in which the sum of Brackstone's deficiencies can be ascribed to trial strategy gone awry. As his own testimony in the state post-conviction proceeding made clear, he simply *had* no strategy. Thus, his inaction cannot be characterized as bad judgment stemming from a misguided, but competent, factual or legal investigation. He made no investigation; he made no judgment.

The question then becomes whether it is necessary for Groseclose to demonstrate prejudice, under Strickland's second prong, or whether, as the district court believed, Brackstone's performance was so inept as to amount to a constructive denial of counsel, relieving Groseclose of the need to show prejudice. This is not a dispute we need decide, because the prejudice resulting from Brackstone's lawyering is so patent. We find it quite clear that there were defense tactics available to a reasonably competent attorney that create a reasonable probability that, in the absence of Brackstone's incompetence, the jury would have had a reasonable doubt respecting Groseclose's guilt. The State's evidence tying Groseclose to the perpetrators of the murder was relatively weak. A defense that capitalized on that weakness, and that marshaled evidence emphasizing it, could certainly have led to a different verdict. Indeed, all that Brackstone need have done to create a much greater probability of a favorable verdict would have been to employ *any* defense, however anemic, that was specifically tailored to Groseclose, rather than a defense that linked Groseclose to Rickman, a man whose lawyer painted him as a vile and dangerous killer.

The prejudice to Groseclose resulting from his lawyer's performance is even easier to discern in the context of the sentencing phase. In addition to having no criminal history, Groseclose was very active in his church, had a positive military record, and had a plethora of family members willing to testify on his behalf. There is a reasonable probability that, absent Brackstone's utter failure to develop or even advert to these mitigating factors, the jury would have concluded that the balance of aggravating and

mitigating circumstances did not warrant the death sentence.

### B.

Given our unambivalent conclusion that Groseclose was denied effective assistance of counsel in a constitutional sense, we find it unnecessary to examine the voluminous remaining assignments of error brought forward by the State in this appeal. Thus, even if we were to agree that the district court erroneously concluded that the State knowingly presented false and misleading testimony and withheld evidence, or unconstitutionally administered medication to Groseclose during trial, or that the jury instructions were flawed in a variety of ways, that would not change the outcome of this appeal, nor does it matter whether the district court correctly concluded that the cumulative effect of the errors it found resulted in a constitutionally unfair trial. It is, likewise, unnecessary to reach the merits of Groseclose's claims regarding the composition of the jury venire, despite the State's urging that we rectify the district court's decision not to reach that issue. The tenets of judicial economy mandate that we not resolve issues that cannot alter our final decision.

▉▉▉ We note in passing, however, the complete lack of merit to Groseclose's position that because various jury instructions were constitutionally defective, the Double Jeopardy Clause prohibits the State from retrying him. The Double Jeopardy Clause is implicated by the issuance of a writ of *habeas corpus* when the basis for the issuance is an insufficiency of the evidence—the failure of the prosecution to prove its case. *See Poland v. Arizona,* 476 U.S. 147, 152–53, 106 S.Ct. 1749, 1753–55, 90 L.Ed.2d 123 (1986). Otherwise, as a general matter, "there is no double jeopardy bar to retrying a defendant who has succeeded in overturning his conviction." *Bullington v. Missouri,* 451 U.S. 430, 442, 101 S.Ct. 1852, 1860, 68 L.Ed.2d 270 (1981). " '[R]eversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its cases.' " *Id.* (citation omitted). Erroneous instructions plainly fall in the category of trial error. *See Burks v. United States,* 437 U.S. 1, 15, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978); *see also Saylor v. Cornelius,* 845 F.2d 1401, 1403 (6th Cir.1988). There is, in short, no bar to retrial.

### IV.

Because Groseclose received constitutionally ineffective assistance of counsel, we **AFFIRM** the district court's issuance of a writ of *habeas corpus.*

SUHRHEINRICH, Circuit Judge, dissenting.

During the morning of June 29, 1977, twenty-four year old Deborah Lee Groseclose was raped twice, strangled into unconsciousness, stabbed three or four times in the back, kidnapped from her house, and left locked in the trunk of her automobile which was abandoned in a parking lot in Memphis, Tennessee. Deborah's badly decomposed body was not found until five days later. It was determined that Deborah, who was still alive at the time her automobile was abandoned, had died from heat exposure. By the time Deborah's body was found on July 4, 1977, her eyeballs had been eaten by the maggots which filled her eye sockets.

In 1978, Petitioner William E. Groseclose (Groseclose), Deborah's husband and the 'father of her infant son Nathan, was convicted of first degree murder for hiring Ronald Eugene Rickman to kill Deborah, and the jury subsequently sentenced Groseclose to die in Tennessee's electric chair. In 1981, the Tennessee Supreme Court affirmed Groseclose's and Rickman's convictions and death sentences, finding the evidence of guilt "overwhelming." *State v. Groseclose,* 615 S.W.2d 142, 146 (Tenn.1981). Today, more than twenty years after Deborah's horrific murder, the majority in the present case affirms the district court's grant of a writ of *habeas corpus* overturning Groseclose's conviction and death sentence on the grounds that Groseclose was denied his Sixth Amendment right to the effective assistance of counsel. I disagree. A defendant asserting an ineffective assistance claim generally must show not only that defense counsel's performance was deficient but also that this deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687,

104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Even assuming that Attorney Brackstone's representation was deficient, Groseclose has not shown that Brackstone's representation actually prejudiced his defense.[1] In addition, I do not agree with the district court's decision to presume prejudice in this case. For these reasons, I would reject Groseclose's ineffective assistance of counsel argument. I, therefore, respectfully dissent.

### I.

### A.

As the Supreme Court explained in *United States v. Cronic,* 466 U.S. 648, 665 n. 38, 104 S.Ct. 2039, 2050 n. 38, 80 L.Ed.2d 657 (1984): "We consider in this case only the commands of the Constitution.... We address not what is prudent or appropriate, but only what is constitutionally compelled."[2] In *Cronic,* the Court also stated that "the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." *Id.* at 658, 104 S.Ct. at 2046. Therefore, notwithstanding an attorney's deficient performance, the Sixth Amendment generally is not implicated unless there is some effect on the reliability of the trial. *Id.* A defendant must generally prove the prejudice, if any, which resulted from defense counsel's deficient performance. *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067. The defendant must show a reasonable probability that, but for counsel's particular errors, the factfinder would have had a reasonable doubt with respect to the defendant's guilt. *Id.* at 695, 104 S.Ct. at 2068–69. Similarly, with respect to a death sentence, the defendant must show that there is a reasonable probability that, absent counsel's errors, the sentencer, including an appellate court to the extent it independently reweighs the evidence, would have concluded that the balance of the aggravating and mitigating circumstances did not warrant the imposition of the death penalty. *Id.* A reasonable probability

is one which is sufficient to undermine confidence in the outcome of the proceeding. *Id.* at 694, 104 S.Ct. at 2068.

In *Strickland,* the Supreme Court discussed in detail the approach a reviewing court should take in conducting this inquiry. The Court stated as follows:

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.* at 695–96, 104 S.Ct. at 2069.

Recently, in *Lockhart v. Fretwell,* 506 U.S. 364, 369–70, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180 (1993), the Court explained that the focus of *Strickland*'s prejudice inquiry is not solely on outcome determination. The Court quoted from *Strickland* where it explained that "a criminal defendant alleging prejudice must show that 'counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* at 369, 113 S.Ct. at 842 (quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064). The *Lockhart* Court stated:

> [A]n analysis focusing solely on mere outcome determination, without attention to

---

**1.** In *Strickland v. Washington,* 466 U.S. 668, 697, 104 S.Ct. 2052, 2069–70, 80 L.Ed.2d 674 (1984), the Supreme Court indicated that it was not necessary to address both components of an ineffectiveness inquiry if the defendant makes an insufficient showing on one.

**2.** The Supreme Court further observed in *United States v. Cronic,* 466 U.S. 648, 665 n. 38, 104 S.Ct. 2039, 2050 n. 38, 80 L.Ed.2d 657 (1984): "It is entirely possible that many courts should exercise their supervisory powers to take greater precautions to ensure that counsel in serious criminal cases is qualified."

whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him. *See Cronic, supra,* at 658, 104 S.Ct. at 2046. *Id.* at 369–70, 113 S.Ct. at 842–43 (internal footnote omitted). For the reasons discussed below, Groseclose fails both aspects of the prejudice inquiry.

## B.

The majority in this case determines that Groseclose has shown that Attorney Brackstone's representation was objectively unreasonable and that Groseclose's defense was prejudiced as a result of this representation. In the majority's view, the prosecution's evidence linking Groseclose to the perpetrators of the murders was "relatively weak." Maj. op. at pp. 1170–1171. The majority opines that a defense · which capitalized on this "weakness" and marshaled evidence emphasizing it "could certainly" have produced a different verdict. *Id.* at p. 1171. The majority concludes: "all that Brackstone need have done to create a much greater probability of a favorable verdict would have been to employ *any* defense, however anemic, that was specifically tailored to Groseclose...." *Id.*

The majority's analysis is as conclusory as it is unconvincing. In *Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069, the Supreme Court recognized that some attorney errors will have only an "isolated, trivial effect" on the evidentiary picture. Such is the case here with respect to the alleged errors of Attorney Brackstone. Assuming that Attorney Brackstone's representation was deficient, there is not a reasonable probability that, but for this allegedly deficient representation, the jury would have had a reasonable doubt with respect to Groseclose's guilt in this case. As the Tennessee Supreme. Court noted, the evidence of Groseclose's guilt was "overwhelming." *State v. Groseclose,* 615 S.W.2d at 146. Moreover, despite several post-con-

viction challenges over the past two decades, Groseclose has never presented any exculpatory evidence. Nor is there even a scintilla of evidence to suggest that Rickman and Britt planned Deborah's murder and then sought to implicate Groseclose after the fact in order. to mitigate their own responsibility.[3] Groseclose's ineffective assistance claim must fail. *Cf. Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069 ("a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.").

The following is a summary of some of the overwhelming evidence of Groseclose's guilt introduced by the State at trial almost twenty years ago:

1. Barton Wayne Mount, a naval recruit Groseclose met while employed in the Navy Recruiting Service, testified that Groseclose wanted Deborah's murder to look like a "rape-robbery," presumably to divert suspicion from himself. Mount testified that Groseclose was originally willing to pay $50 for Deborah's murder. After Mount informed Groseclose that Britt was unwilling to do it for this amount, Groseclose increased the terms of the deal. Groseclose agreed to pay $200 up front and $500 after the murder, and he would also give Britt a .45 caliber pistol. Mount further testified that, while he was with Groseclose on June 27, 1977, Groseclose withdrew $100 from an automated teller machine at the corner of Hollywood and James Roads in Memphis and borrowed $50 from a friend at the Cracker Barrel convenience store. Mount testified that Groseclose then handed him $150 and instructed him to give the money to Britt. This was two days prior to Deborah's murder. As corroboration, the prosecution offered the testimony of Wayne Robertson of First Tennessee Bank of Memphis and Melville Taylor. Mr. Robertson testified that $100 was withdrawn from Deborah and Bill Groseclose's account at 9:03 p.m. on June 27, 1977, by use of the

---

3. Rickman and Britt gave incriminating statements to the police, which discussed the murder and implicated Groseclose. After a full suppression hearing, both statements, in redacted form, were admitted into evidence and read to the jury.

References to the other co-defendants were deleted from the redacted versions of each statement. At the sentencing hearing following trial, Rickman's and Britt's unredacted statements were read in full.

bank card issued to Bill Groseclose. Mr. Robertson testified that the money was withdrawn from the machine at the Hollywood and James branch of First Tennessee Bank. Mr. Taylor testified that he ran into Groseclose on the evening of June 27, 1977, while leaving the Cracker Barrel Quick Shop Grocery. Mr. Taylor testified that he loaned Groseclose $50 after Groseclose asked for it so that he could pay for a psychiatrist for his wife.

In affirming Groseclose's first degree murder conviction and death sentence, the Tennessee Supreme Court properly described Mount's testimony as "devastating." *State v. Groseclose*, 615 S.W.2d at 145. Although cross-examined by counsel for all three defendants, Mount's testimony clearly demonstrates that the murder was committed by Rickman and Britt on behalf of, and after being procured by, Groseclose. *Id.*

2. Pam Baker Lindsey, Rickman's former girl friend, testified at trial that Rickman confessed to her that he and Britt had murdered Deborah, and he explained to her how they carried it out. Mrs. Lindsey also described in detail two meetings she attended at a Shoney's restaurant in the days immediately preceding Deborah's murder.[4] Mrs. Lindsey testified that the first meeting was three days before the murder. Groseclose and Rickman talked mainly about Deborah, and Groseclose showed Rickman a picture of her. Mrs. Lindsey attended a second meeting the night before the murder in which Groseclose, Rickman, and Britt were present. Mrs. Lindsey stated that Groseclose, Rickman, and Britt discussed a "job" that Rickman and Britt were to do for Groseclose the following morning. Mrs. Lindsey explained that Groseclose instructed Rickman and Britt to arrive at his house at 6:30 a.m. the next morning and to wait for him in the tool shed in the back of his house. Mrs. Lindsey testified that, after leaving Shoney's, she and Rickman followed Groseclose to an automatic teller machine

where he withdrew money and gave it to Mrs. Lindsey who passed it to Rickman.[5] In addition, Mrs. Lindsey testified that she drove with Rickman and Britt to Groseclose's house either during the afternoon of the day Deborah was murdered or during the afternoon of the following day. Britt got out of the car and spoke with Groseclose at the house.

3. Deborah's mother, Aline Watts, testified that Groseclose and Deborah were having marital problems at the time of Deborah's murder. Mrs. Watts also testified that she received a telephone call from Groseclose on the morning of the murder. Groseclose informed Mrs. Watts that he had received a call from Deborah's employer after she did not show up for work. Mrs. Watts telephoned the police and then went to Groseclose's house to pick up the couple's infant child. Mrs. Watts testified that, while at the house, she saw Mount and Britt, at separate times, talking to Groseclose.

4. Doyle Scroggins testified that in June 1975 Groseclose purchased an insurance policy on Deborah's life. Groseclose was the beneficiary of the policy, which had a face value on the date of Deborah's murder of approximately $12,000. In addition, James Perkins testified that he sold Groseclose a life insurance policy in late July or August 1975. Groseclose purchased $30,000 of life insurance on himself, as well as a rider[6] on Deborah for $20,000. Groseclose was the first beneficiary on Deborah's portion of the policy. Mr. Perkins testified that Groseclose contacted his office in May 1977, the month prior to Deborah's murder, and stated that there was an error in his policy. Mr. Perkins testified that Groseclose contended that the entire policy should have been on Deborah's life, and he wanted the policy changed accordingly. Mr. Perkins stated that he convinced Groseclose that it was in his best interests to leave the policy as

---

**4.** Mrs. Lindsey was not indicted in connection with Deborah's murder.

**5.** Mr. Robertson testified that $40 was withdrawn from Deborah and Bill Groseclose's account at 6:36 p.m. on June 28, 1977, by use of

the bank card issued to Bill Groseclose. The money was withdrawn at the Hollywood and James branch of First Tennessee Bank.

**6.** A "rider" is an additional insured person on the named insured's policy.

written. The Tennessee Supreme Court noted that Groseclose's desire to obtain the life insurance proceeds may have been one of the motives for the murder. *State v. Groseclose,* 615 S.W.2d at 144.

5. John Shanks, who was recruited by Groseclose for the Navy, testified that Groseclose had asked him, in November or December of 1976, if he would be interested in killing Groseclose's wife. Michael Blasco, another recruit, testified that Groseclose had asked him, in May or June of 1977, if he knew somebody who would do some "hit work."

Because there is neither a reasonable probability that the outcome of the guilt phase of Groseclose's trial would have been any different but for Attorney Brackstone's alleged errors, nor any basis for concluding that Groseclose's trial was fundamentally unfair or unreliable, no Sixth Amendment violation inheres. *Lockhart,* 506 U.S. at 370, 113 S.Ct. at 843; *Scarpa v. Dubois,* 38 F.3d 1, 16 (1st Cir.1994).[7]

### C.

The majority finds the prejudice resulting from Attorney Brackstone's representation at the sentencing stage "even easier to discern." *Id.* The majority opinion states that, in addition to having no criminal record, Groseclose was active in his church, had a positive military record, and a "plethora" of family members who were willing to testify on his behalf. *Id.* The majority concludes that, but for Attorney Brackstone's "utter failure to develop or even advert to these mitigating factors," there is a reasonable probability that the jury would have concluded that the balance of the aggravating and mitigating

circumstances in the case did not warrant a death sentence. *Id.* I disagree.

At the outset, I wish to clarify several points with respect to the majority's analysis. First, Groseclose did, in fact, testify on direct examination during the sentencing stage that he had never previously been arrested or indicted for a crime. The prosecution did not rebut this on cross-examination. Second, although his actual military records were not introduced, Groseclose nonetheless testified that he had been assigned to a destroyer during the Vietnam conflict, had been in combat, and had received a few wounds. Groseclose testified that he had been awarded, among other things, the Vietnamese Service Medal with three bronze stars and the Good Conduct Medal. On cross-examination, the prosecution did not question this aspect of Groseclose's testimony either. Third, I am unconvinced that Groseclose was *active* in his church. Gladys Adams, the general overseer of the Church of God in Memphis, Tennessee, testified in the district court that she knew Groseclose who was her son's neighbor. Mrs. Adams testified that, after Groseclose's arrest, she visited with him weekly in the Shelby County jail, and, in her view, Groseclose was "sincere about his commitment to Christ." Following his conviction and death sentence, Groseclose became an ordained minister of the Church of God. Mrs. Adams testified that the Church licensed Groseclose "in desperation to get religious services in the Death Row." However, when asked what church Groseclose had attended prior to his arrest, Mrs. Adams could only testify: "He was a Methodist, and I think that he did attend." The district court testimony of Mrs. Watts, Groseclose's mother-in-law, is

---

7. Also unconvincing is the testimony of Groseclose's experts. In the district court, Groseclose offered the testimony of William Marett, an attorney who actually represented Groseclose for a time in the 1980's during Groseclose's state post-conviction proceedings. Mr. Marett testified that he believed that Attorney Brackstone's representation resulted in legal prejudice to Groseclose. With respect to the existence of any possible evidence which would have supported Groseclose's defense, Mr. Marett testified that he never conducted any investigation; however, Mr. Marett opined that there were "a lot of things" which could have been brought out to challenge the statements of the co-defendants and cast doubt

on their veracity. In addition, despite rendering an opinion as to prejudice, Mr. Marett conceded on cross-examination that he was "not very familiar" with respect to the facts of the case as to guilt. Groseclose also offered the expert testimony of Charles Fels. Mr. Fels testified that, on the basis of the deficiencies he perceived in Attorney Brackstone's performance, Brackstone was, in fact, an "ally of the prosecution" and this was "inherently prejudicial." *This analysis seems more like a finding of prejudice per se than a finding of any actual prejudice resulting from Attorney Brackstone's representation. I shall address this issue in section II.*

also instructive. Mrs. Watts was asked on direct examination if she was aware of any religious activity on the part of Groseclose before his arrest. Mrs. Watts succinctly responded: "I have never known him to go to church." It appears that Groseclose's religious conversion did not occur until after his conviction and death sentence for his wife's contract murder.

There are several reasons why I reject the majority's decision to find prejudice at the sentencing stage. First, as the facts plainly demonstrate, Deborah's murder was absolutely horrific, "one of the most brutal and atrocious imaginable." *State v. Groseclose,* 615 S.W.2d at 145. Second, Groseclose was the master mind behind this murder. Third, Deborah was Groseclose's wife and the mother of his infant child. Fourth, in the event additional mitigating character evidence had been introduced, the prosecution would have responded in kind. In the district court, Hugh Stanton, former District Attorney General for Shelby County, testified that the prosecution would have attacked Groseclose's character by recalling Mrs. Watts to testify as to how Groseclose "whipped on" Deborah while she was pregnant. Fifth, unlike the district court below, I would place no reliance on the fact that Britt was only sentenced to life in prison as opposed to the death penalty. Indeed, as the Tennessee Supreme Court noted, there were compelling differences between Britt and his co-defendants. Some of these included: (1) Britt was only nineteen years old at the time of the murder; (2) there was substantial evidence in the record that Britt was subject to domination and influence by the older Rickman; and (3) unlike his co-defendants, Britt manifested regret and remorse over the incident. *Id.* at 149. Britt did not formulate the plan to kill Deborah, nor was he the victim's husband and the father of her baby.

The legal standard articulated in *Strickland* is "highly demanding." *Kimmelman v. Morrison,* 477 U.S. 365, 382, 106 S.Ct. 2574, 2586–87, 91 L.Ed.2d 305 (1986). The defendant must demonstrate that a reasonable probability exists that, but for defense counsel's errors, the sentencer, including an appellate court to the extent it independently reweighs the evidence, would have concluded that the balance of the aggravating and miti-

gating circumstances in the case did not warrant the imposition of the death penalty. *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068–69. A reasonable probability, the Supreme Court explained, is one which is sufficient to undermine confidence in the outcome. *Id.* The jury at Groseclose's trial found two aggravating circumstances: (1) Groseclose employed another to commit the murder for remuneration; and (2) the murder was especially heinous in that it involved depravity of mind. I conclude that there is not a reasonable probability that either the jury or the Tennessee Supreme Court would have concluded that Groseclose did not deserve the death penalty for Deborah's murder. In my view, the balance of the aggravating and mitigating circumstances still would have warranted the death penalty in the case of this horrific contract murder. Because there is not a reasonable probability that the outcome of the sentencing stage of Groseclose's trial would have been any different but for Attorney Brackstone's allegedly deficient representation, nor any basis for concluding that Groseclose's death sentence was fundamentally unfair or unreliable, I would reject Groseclose's ineffective assistance challenge to the sentencing stage as well. *Lockhart,* 506 U.S. at 370, 113 S.Ct. at 843.

## II.

The majority finds that the prejudice resulting from Attorney Brackstone's representation is "so patent" that the majority need not consider the apparently more difficult question of whether Attorney Brackstone's representation was "so inept as to amount to a constructive denial of counsel, relieving Groseclose of the need to show prejudice." Maj. op. at p. 1170. Unlike the majority, the district court below reached this question and concluded that there was prejudice per se. The district court found that Attorney Brackstone failed to remain an "active advocate" who observed a duty of "zealous and loyal representation" of his client. *Groseclose v. Bell,* 895 F.Supp. at 960. The district court determined that Attorney Brackstone deprived Groseclose of a fair trial because Brackstone failed to subject the prosecution's case to meaningful adversarial testing and failed to function in any meaningful sense as

the Government's adversary. *Id.* The court relied, in large part, upon dicta contained in the Supreme Court's decision in *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), as well as upon the Tenth Circuit's decision in *Osborn v. Shillinger*, 861 F.2d 612 (10th Cir.1988). The court also cited to the Ninth Circuit's decision in *United States v. Swanson*, 943 F.2d 1070 (9th Cir.1991). Since I would reject Groseclose's actual prejudice argument, I must consider the district court's decision to find prejudice per se.

### A.

In *Cronic*, the Supreme Court explained in dicta that certain circumstances are so likely to prejudice the accused that the cost of litigating their effect on a particular case is unjustified:

> Most obvious, of course, is the complete denial of counsel. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial.[25] Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable.

[25] The Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding.

*Cronic*, 466 U.S. at 658–59 & n. 25, 104 S.Ct. at 2046–47 & n. 25. The Court cautioned, however, that apart from circumstances of this magnitude, there generally exists no basis for finding a Sixth Amendment violation unless the defendant can show that counsel's specific errors undermined the reliability of the finding of guilt. *Id.* at 659 n. 26, 104 S.Ct. at 2047 n. 26.

In my dissenting opinion in the companion case of *Rickman v. Bell*, I set forth at length my understanding of the *Cronic* dicta. I reviewed our circuit's narrow applications of the *Cronic* dicta, and I noted my disagreement with the more expansive interpretations of *Cronic* by the Ninth and Tenth Circuits in *Swanson* and *Osborn*, respectively.

I also explained how these expansive interpretations of the *Cronic* dicta frustrated a principal policy underlying the prejudice per se exception; i.e., the desire to avoid the cost of case-by-case litigation over the existence of actual prejudice. I need not repeat this analysis here.

Nor need I recount here the particular elements of Attorney Brackstone's representation which, in the district court's view, warranted the application of the *Cronic* dicta. *See Groseclose v. Bell*, 895 F.Supp. at 958–60. Suffice it to say, there is no reason why the errors in Attorney Brackstone's representation, as found by the district court, are not amenable to the traditional *Strickland* analysis and its requirement of actual prejudice. *See Scarpa v. Dubois*, 38 F.3d 1, 12–13 (1st Cir.1994); *Rickman v. Bell*, (Suhrheinrich, J., dissenting). As the Fifth Circuit explained in *McInerney v. Puckett*, 919 F.2d 350, 353 (5th Cir.1990): "bad lawyering, regardless of how bad, does not support the [per se] presumption; more is required." Indeed, Groseclose himself does not argue on brief that we should find prejudice per se. Groseclose contends only that he has shown actual prejudice resulting from Attorney Brackstone's representation in this case. *See* Appellee's Br. at p. 41.

### B.

The instant case is unlike either of the two examples of constructive denial of counsel discussed in *Cronic*. *See Woodard v. Collins*, 898 F.2d 1027, 1028–29 (5th Cir.1990); *Rickman v. Bell*, (Suhrheinrich, J., dissenting). First, the Supreme Court has consistently found constitutional error without any showing of prejudice where counsel was totally absent or prevented from assisting the defendant during a critical stage of the proceeding. *Cronic*, 466 U.S. at 659 n. 25, 104 S.Ct. at 2047 n. 25. Neither situation occurred here. Second, Attorney Brackstone did not *entirely* fail to subject the prosecution's case to meaningful adversarial testing. *Id.* at 659, 104 S.Ct. at 2047.

At Groseclose's state post-conviction relief hearing in 1982, Attorney Brackstone [8] testi-

8. Attorney Brackstone died in 1994.

fied that he asked Groseclose during their initial meetings for information that would assist Brackstone in preparing a defense. Attorney Brackstone testified that Groseclose stated that "he didn't do it" and Brackstone responded "I'll need more than that." Attorney Brackstone testified that he asked Groseclose about his neighbors, and Groseclose provided Brackstone with the names of several. Attorney Brackstone testified that he met with the neighbors Groseclose had mentioned, as well as with other neighbors that Brackstone had found, in order to determine if any could be of assistance to Groseclose.

Attorney Brackstone further testified that he spoke with the State's investigators, the attorney general, and counsel for the other co-defendants. Attorney Brackstone testified that the State allowed him to review the physical evidence it had in the case, and counsel for the co-defendants provided him with information as to their clients' confessions, which Brackstone subsequently had the opportunity to read. Attorney Brackstone testified that he later interviewed Rickman and Britt in order to verify their statements.[9]

Attorney Brackstone testified that he informed Groseclose that he had reviewed the State's evidence in the case. Attorney Brackstone testified that he told Groseclose "some of the things that I saw," and he advised Groseclose that Groseclose would

probably be convicted if the case proceeded to trial "with the evidence that they had." Moreover, Attorney Brackstone testified that he recommended the possibility of a plea bargain to Groseclose whose response was simply: "no way." [10]

Attorney Brackstone testified that, after Groseclose rejected the possibility of a plea bargain, Brackstone conducted legal research and had discussions with several attorneys who had previously handled death penalty cases in which the guilt and penalty stages of the trial were bifurcated. In addition, Attorney Brackstone filed a Motion of Defendant for State to Produce Statements and Material, which requested, among other things, the names of prosecution witnesses and any evidence that would tend to exculpate Groseclose. The trial court granted this motion. Attorney Brackstone also filed a Motion of Defendant for Psychological Evaluation in order to determine if Groseclose was competent to stand trial. The trial court ordered an evaluation, and the examining physician determined that Groseclose was, in fact, competent.

As the majority notes, Attorney Brackstone agreed to allow Robert Livingston, Rickman's attorney, to act as lead counsel at trial. Attorney Brackstone also testified that his theory at trial "was to do the best I could with what I had." Attorney Brackstone noted that the other defendants had given con-

9. The majority opinion states that "none of the district court's findings of primary fact is in any measure inconsistent with the state courts' findings." Maj. op. at p. 1166. This statement is incorrect. The district court found that Attorney Brackstone "failed to investigate any of the circumstances of the case." *Groseclose v. Bell*, 895 F.Supp. 935, 955 (M.D.Tenn.1995). However, as the majority opinion itself notes, the state trial court had previously concluded, in rejecting Groseclose's petition for post-conviction relief, that Attorney Brackstone "'did[,] after numerous discussions with the petitioner, conduct an investigation of the petitioner's case.'" Maj. op. at p. 1165 (quoting the Tennessee state court's findings). The state trial court's opinion also discussed the elements of this investigation. *See id.*

10. Notwithstanding this testimony, the district court concluded that "Mr. Brackstone failed to form any kind of working relationship with his client" and failed to report to Groseclose "what, if anything, he investigated or what his results were." *Groseclose v. Bell*, 895 F.Supp. at 955.

As support for its conclusions, the district court apparently relied upon the testimony of Groseclose at his state post-conviction relief hearing in 1982. *See id.* Two points must be made. First, Groseclose's testimony is not an acceptable basis for concluding that Attorney Brackstone did not conduct an investigation with respect to the case, because Groseclose was in custody at that time awaiting trial for the contract murder of his wife and could not possibly have known what Attorney Brackstone was doing. Second, with respect to the district court's conclusions as to what Attorney Brackstone actually told Groseclose, the district court apparently made a credibility determination and found Groseclose's self-serving, uncorroborated, death row testimony more credible than Attorney Brackstone's. While I acknowledge that our review of factual findings is deferential, *see* Fed.R.Civ.P. 52(a), the basis for the district court's conclusions is nevertheless highly suspect. In any event, these findings do not affect my ultimate determination that we should not presume prejudice in this case.

fessions, while Groseclose had not. Attorney Brackstone also pointed out that defendant Mount had received a separate trial, and the prosecution had actually used him as a witness in the case. Attorney Brackstone testified that he tried to bring to the jury the possibility "that it could have been some of the codefendants telling a different version of it than he[Groseclose] told." In addition, Attorney Brackstone, like the attorneys for the other two co-defendants, did not put on a defense after the prosecution had presented its case. Thomas Pera, a trial attorney for defendant Britt, testified in the district court and explained that this allowed the defense to "cut away the State's rebuttal." Mr. Pera stated: "Generally around those courts the way the prosecutors do it is they have the opening final argument and then they lay out the case about the guilt and everything and usually rebuttal is when you come back and start talking about the bad things ... the defense doesn't want to hear." While Attorney Brackstone's decision to allow Attorney Livingston to act as lead counsel, his theory at trial, and his strategic decision not to put on a defense may have been deficient, there is still no reason why these errors are not amenable to the traditional *Strickland* prejudice analysis. *See Scarpa*, 38 F.3d at 12–13.

Finally, with respect to the sentencing stage of the trial, Attorney Brackstone called five witnesses. These included Groseclose, one of his neighbors, and three employees from the Navy Recruiting Service where Groseclose had worked. Attorney Brackstone testified that another neighbor, who was allegedly a "good friend" of Groseclose's, "emphatically" refused to testify, and Groseclose's mother had been sick and did not think she could make the trip to testify. In addition, Attorney Brackstone testified that two of the mitigation witnesses offered testimony that was different than what Brackstone had expected following his interviews with the witnesses. Attorney Brackstone testified that he thought Groseclose's neighbor would be outspoken and attempt to assist Groseclose. Attorney Brackstone also testified that Chief John Purcell from the Navy recruiting station "didn't speak so highly" of Groseclose. Attorney Brackstone stated that "he [Chief Purcell] was the one I was told to look up.... Mr. Groseclose gave me his name."

The majority and the district court have found that Attorney Brackstone could have presented additional mitigating evidence. Again, assuming that Attorney Brackstone's representation was deficient in this respect, this error should be subject to the *Strickland* analysis; it is not a basis for finding prejudice per se.

III.

In my dissenting opinion in *Rickman v. Bell*, I explained that, although I did not condone Attorney Livingston's representation in that case, it nevertheless satisfied the minimum standard demanded by the Constitution. Similarly, in the present case, I do not necessarily approve of the representation provided by Attorney Brackstone. I have concluded, however, that Attorney Brackstone's representation comported with the minimum requirements of the Constitution, and that is the end of my inquiry. As the Supreme Court declared in *Cronic*, 466 U.S. at 665 n. 38, 104 S.Ct. at 2050 n. 38: "We address not what is prudent or appropriate, but only what is constitutionally compelled."

Groseclose is unable to show actual prejudice resulting from his attorney's representation, and his case does not fall within the narrow exception to this requirement discussed in dicta in *Cronic*. Therefore, I would reject Groseclose's ineffective assistance of counsel claim. The majority's holding to the contrary grants "the defendant a windfall to which the law does not entitle him." *Lockhart v. Fretwell*, 506 U.S. 364, 370, 113 S.Ct. 838, 843, 122 L.Ed.2d 180 (1993). From that holding, I respectfully dissent.