RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2000 FED App. 0221P (6th Cir.)
File Name: 00a0221p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JAMES DAVID CARTER,
      *Petitioner-Appellant,*

      *v.*

RICKY BELL, Warden; PAUL
SUMMERS, Attorney General,
      *Respondents-Appellees.*

No. 99-5270

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 93-00018—Thomas G. Hull, District Judge.

Argued: March 7, 2000

Decided and Filed: July 7, 2000

Before: NELSON, CLAY, and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Gary C. Shockley, BAKER, DONELSON,
BEARMAN & CALDWELL, Nashville, Tennessee, for
Appellant. Daryl J. Brand, OFFICE OF THE ATTORNEY
GENERAL, Nashville, Tennessee, for Appellees.
**ON BRIEF:** Gary C. Shockley, BAKER, DONELSON,
BEARMAN & CALDWELL, Nashville, Tennessee, for

Appellant. Daryl J. Brand, Glenn R. Pruden, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellees.

_____

## OPINION

_____

CLAY, Circuit Judge. Petitioner James David Carter appeals from the order of the district court, adopting and approving the magistrate judge's report and recommendation, stating additional findings, and denying Carter's claims regarding ineffective assistance of counsel. For the reasons set forth below, we **REVERSE** in part and **AFFIRM** in part.

### I.

We summarize the following facts from the Tennessee Supreme Court's opinion on direct appeal. *See State v. Carter*, 714 S.W.2d 241 (Tenn. 1986).

On February 16, 1984, Carter drove with Danny Price to the Interstate 81 rest area near Baileyton, Tennessee. They planned to steal a car that they could use in a robbery the next day. *Id.* at 243.

Clarence A. Lile, a 72 year old Oklahoma resident, stopped at the rest area just after midnight. As Price watched, Carter entered the restroom and emerged shortly with Lile. The two got into Lile's pickup truck and left the area. Price followed in Carter's car. Carter forced Lile to drive to a secluded area known as the Bluffs, which overlooked Cherokee Lake. Price watched Carter shoot Lile four times at close range and roll Lile's body off the cliff. The body was found a foot short of the lake the next day. *Id.*

The Hamblen County grand jury indicted Carter and Price in March of 1984, charging Carter in Counts I and III with first degree murder of Lile and as a habitual criminal under Tennessee Code Annotated § 40-2801 (1982) (repealed

evaluative judgment on the relative horror of one murder over another. *Arave v. Creech*, 507 U.S. 463, 472 (1993). Section 39-2-303(i)(6) does not facially violate the Eighth Amendment.

For these reasons, we **AFFIRM** in part and **REVERSE** in part the judgment of the district court; we affirm in all respects the judgment of guilt entered on the jury's guilty verdict, but reverse the judgment of the sentence of death because of the ineffective assistance of counsel at the sentencing phase of the trial. We **REMAND** the case to the district court with instructions to issue a writ of *habeas corpus* vacating Carter's death sentence due to the ineffective assistance of counsel he received at the sentencing phase of the trial, unless the state conducts a new penalty proceeding within 180 days after remand.

aggravating circumstances "is not susceptible of mathematical precision," federal court vagueness review is "quite deferential." *Id.* at 973. An aggravating factor "is not unconstitutional if it has some 'common-sense core of meaning . . . that criminal juries should be capable of understanding.'" *Id.* The states may adopt capital sentencing processes that rely on the jury's judgment to exercise wide discretion in individualized sentencing. *Id.* at 974. The few aggravating factors that have been found unconstitutionally vague were those stated to the jury in terms including pejorative adjectives describing the crime as a whole, or in a form requiring a yes or no answer to specific question. *Id.* at 974-75. As examples of the rare unconstitutionally vague factor, the court in *Tuilaepa* noted instances where aggravating circumstances were those defined as a murder that was "especially heinous, atrocious, or cruel," *Maynard* 486 U.S. at 363-64, or as "outrageously or wantonly vile, horrible and inhuman," *Godfrey*, 446 U.S. at 427-29. *Tuilaepa*, 512 U.S. at 974.

The *Tuilaepa* court approved of aggravating factors focusing on the "circumstances of the crime" and on "[t]he presence or absence of criminal activity by the defendant [which involved] the use or attempted use of force or violence or the express or implied threat to use force or violence." *Id.* at 976. Following the same analysis, the district court properly rejected Carter's vagueness challenge by finding that the avoidance of arrest or prosecution factor contains no pejorative language describing the crime as a whole; is not phrased in terms requiring a yes or no answer; focuses the jury's attention on specific circumstances rather than the crime as a whole; and imparts a common-sense meaning capable of understanding by a jury.

We agree with the district court and find that § 39-2-203(i)(6) contains a "common-sense core of meaning . . . criminal juries should be capable of understanding." *Tuilaepa*, 512 U.S. at 973. The statute definition does not contain "pejorative adjectives . . . that describe a crime as a whole" or language which invites the jury to make an

1989). Count II charged Price with aiding and abetting Lile's murder.

In July of 1984, police investigators contacted Michael Garber, the maintenance man on the late-night shift at the Interstate 81 rest area. They informed Garber that they were investigating a homicide, and showed him photographs of Carter, Price, Lile, Carter's car and Lile's pickup truck. Garber responded that he had seen the three men together at the rest area, but he could not place the date other than to recall it was a cold night. Garber said he had kept an eye on Carter and Price because he had been alerted to a rash of recent thefts at the rest area. He recalled that one of the two men left with Lile in a pickup truck that night.

Carter was declared indigent and the court appointed Mindy Norton Seals and Douglas R. Beier to defend him. At trial on the charge of murder in the first degree, Price testified against Carter. Price had previously pled guilty to second-degree murder in return for a sentence of thirty-five years.

Carter relied on an alibi defense, which was supported by the testimony of one witness. The jury convicted Carter of first degree murder by a general verdict.

Under the bifurcated Tennessee system, the same jury which convicted Carter determined his sentence. During the sentencing phase of the trial, both the State and the defense were offered the opportunity to present proof of aggravating and mitigating circumstances under then Tennessee Code Annotated § 39-2-203 (1982)(repealed 1989). The State rested on the evidence it had presented during the guilt phase relevant to the aggravating circumstances. The defense neither investigated nor introduced any evidence of mitigating factors, basing its argument on a theory of residual doubt by appealing to any lingering doubt the jury might have had regarding the conviction in an attempt to dissuade the jury from imposing the death penalty. The jury sentenced Carter to death pursuant to Tennessee Code § 39-2-203, finding no mitigating evidence and two statutory aggravating factors: 1) that the murder was committed for the purpose of avoiding,

interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and 2) that the murder was committed while the defendant was engaged in committing larceny and kidnapping. *See* Tenn. Code Ann. § 39-2-203(i)(6), (7) (1982). The judgment was affirmed by the Tennessee Supreme Court and the United States Supreme Court denied *certiorari*. *See State v. Carter*, 714 S.W.2d 241 (Tenn. 1986), *cert. denied*, 479 U.S. 1046 (1987).

Carter filed a *pro se* petition for state post-conviction relief raising a claim of ineffective assistance of counsel and other issues. The trial court denied relief after an evidentiary hearing and the Tennessee Court of Criminal Appeals affirmed the denial of relief in September of 1989. The Tennessee Supreme Court denied permission to appeal.

While the appeal from denial of his first post-conviction petition was pending, Carter filed a second post-conviction petition. The trial court dismissed the petition and the Court of Criminal Appeals affirmed the dismissal on the grounds that the trial court lacked jurisdiction to consider the second petition while the first petition remained on appeal. *See Carter v. State*, 802 S.W.2d 223 (Tenn. Crim. App. 1990). On January 7, 1991, the Tennessee Supreme Court denied permission to appeal.

In March of 1991, Carter filed a petition for writ of *habeas corpus* in the United States District Court for the Middle District of Tennessee. The district court issued a stay of execution, appointed counsel, and *sua sponte* transferred the case to the United States District Court for the Eastern District of Tennessee. On November 2, 1994, the district court granted summary judgment for Respondents on several of Carter's claims, including his allegation that a pretrial photo identification procedure was unconstitutionally suggestive, his claim regarding failure of the trial court to reinstruct the jury at the sentencing hearing as to the elements of the underlying felonies for felony murder, and his claim that the "avoidance of arrest" aggravating circumstance was unconstitutionally vague. On December 28, 1994, the district

There is nothing in those few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence. A person of ordinary sensibility could fairly characterize almost every murder as "outrageously or wantonly vile, horrible, and inhuman." Such a view may, in fact, have been one to which members of the jury in this case subscribed.

446 U.S. at 428-29.

The Tennessee Supreme Court has construed § 39-2-203(i)(6) as requiring only that avoidance of arrest or prosecution be one of the purposes motivating the murder, not the sole or predominant motive. *See State v. Bush*, 942 S.W.2d 489, 504 (Tenn. 1997); *State v. Smith*, 868 S.W.2d 561, 581 (Tenn. 1983); *Carter*, 714 S.W.2d at 250. Tennessee Courts do not apply § 39-2-203(i)(6) when the State's theory is that the victim was killed to prevent the defendant's arrest or prosecution for the killing, i.e., to prevent the victim from being a witness to his own murder. *See Bush*, 942 S.W.2d at 504. However, the aggravating circumstance applies when the evidence supports a finding that the victim was killed to prevent the defendant's apprehension and prosecution for a separate offense. *Id.* Therefore, Carter's interpretation of the statute is not supported by law.

Carter emphasizes that the Tennessee Supreme Court at one point referred to Carter's overall conduct, including disposing of Lile's body, as motivated by a desire to avoid detection and apprehension for the Lile murder. However, Carter ignores the court's finding that Carter was motivated to kill Lile in order to avoid detection and arrest for stealing Lile's truck and for the planned robbery to be accomplished in Lile's truck. *See Carter*, 714 S.W.2d at 247, 250.

Carter's argument, though couched in the terms of vagueness, does not implicate the second requirement. In rejecting Carter's vagueness challenge, the district court applied the principles enunciated in *Tuilaepa*, 512 U.S. at 973-75. Because "the proper degree of definition" of

§ 39-2-203(i)(6) (1982)(repealed 1989). The jury found this aggravator applicable to the facts in Carter's sentencing.

On direct appeal, the Tennessee Supreme Court found that the evidence supported a finding that Carter's motive in killing Lile and disposing of his body was to "avoid detection and apprehension for the murder and the planned robbery to be accomplished in Lile's truck." *Carter*, 714 S.W.2d at 250. Further, the state court found that only Price's testimony that he and Carter needed a clean car to use in a planned robbery explained the crime. "No other motive was expressed or could be implied from the evidence in this case for the activities of Price and defendant at the Interstate 81 rest stop or for the murder and attempt to dispose of the body in the lake." *Id.* at 247.

Under controlling law, "the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action." *Maynard v. Cartwright*, 486 U.S. 356, 362 (1988). Statutory aggravating circumstances are constitutional so long as they meet two requirements. "First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994).

The substance of Carter's argument is that the Tennessee statute can be interpreted as a catchall in violation of the first requirement. An aggravating circumstance is constitutionally invalid "[i]f the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty." *Arave*, 507 U.S. at 474.

In *Godfrey*, the Supreme Court held that Georgia's "outrageously or wantonly vile, horrible or inhuman" aggravating circumstance was unconstitutional because:

court granted summary judgment in favor of Respondents on Carter's claims that the prosecution failed to disclose relevant evidence. The district court referred the case to a magistrate judge for an evidentiary hearing on Carter's remaining claims of ineffective assistance of counsel.

The proof presented at the evidentiary hearing on ineffective assistance of counsel at sentencing showed that, at the time of appointment, Beier had been licensed as an attorney for seven years and Seals for three. Beier had handled between three and five prior capital cases; Seals had been counsel of record in one such case and had assisted her employer in another. Neither had previously prepared or presented a sentencing phase defense under Tennessee's bifurcated capital trial scheme.

At the time of their appointment, Beier was a Juvenile Court Judge for Hamblen County and Seals was Juvenile Court Officer where her duties included prosecution of juveniles charged with delinquency for the State. Because of Beier's sentencing of Carter's cousin and for other reasons, Carter and Beier did not get along. Consequently, Seals was the primary contact with Carter while Beier pursued factual investigation of the offense and Carter's alibi defense. In dividing up trial preparation tasks, Beier prepared a list of twenty-seven different tasks to be pursued. Beier testified that he and Seals met and went over the list, placing the initials of the responsible attorney next to each task. Of the twenty-seven items on the list, only one, listed as "aggravated circumstances," was related to the sentencing phase of the trial. Beier testified that this task was assigned to him and would have included any investigation of both aggravating circumstances and mitigating circumstances.

Beier also testified that Seals might have done some sentencing phase investigation or research. Beier testified that he reviewed the list of aggravating circumstances and statutory mitigating circumstances set out in the statute. *See* Tenn. Code Ann. § 39-2-203. Beier did not recall investigating any non-statutory mitigating circumstances but

suggested that Seals might have done so. Seals testified that she did not. Beier also testified that he discussed with Carter whether he wanted to testify at the sentencing phase. Although Beier testified that he did meet with Carter's mother and other members of Carter's family, he could not recall whether potential mitigating evidence was discussed, nor which family members were present. Beier's time records did not shed any light on either point. Beier testified that he spent 90-95% of his pretrial time on guilt-phase issues.

Seals confirmed that she was the principal contact with Carter and that Carter and Beier did not get along. Seals testified that she was not aware of any investigation of potential statutory or non-statutory mitigating circumstances by counsel. Seals recalled meeting with Carter's mother but could not recall the substance of her discussions. Seals also pointed out that her time records showed a single meeting with one of Carter's sisters but could not recall who this was or what was discussed. Seals also confirmed that counsel neither obtained a release from Carter to view his personal or prison records nor sought any available records of Carter or his family. Seals testified that 95% of her time was spent on guilt-phase issues.

At one point, Carter's counsel filed a notice of insanity defense with the court. Beier testified that Carter did not approve of the filing of notice of an insanity defense, and therefore the defense was not pursued. Counsel also filed a motion seeking appointment of a psychologist or psychiatrist to assist in the defense at both guilt and sentencing phases. Beier and Seals testified, however, that this motion was probably not pursued before the trial court. The defense was assisted by a volunteer psychologist, Dr. Charles Bebber, in jury selection. Dr. Bebber was not asked to examine or evaluate Carter and did not assist in preparation or presentation of a sentencing phase defense.

Beier testified that the defense strategy at the guilt phase was to create a reasonable doubt through impeachment of Carter's co-defendant, Price. Beier also testified that the

witness. Carter claims that it suffers from the same unconstitutional vagueness condemned in *Godfrey v. Georgia*, 446 U.S. 420 (1980), and, therefore violates the Eighth Amendment. The district court held that Carter had failed to present this claim to the state courts on direct appeal and therefore he had defaulted federal review on its merits. Despite the procedural bar, the district court determined that the claim was meritless, finding that the statute imparts a common-sense meaning which a juror would understand.

We do not agree with the district court's holding that Carter has defaulted federal review of this claim. Carter's first post-conviction petition contained a challenge to the statute as unconstitutional. His second post-conviction petition included a claim that the entire statute failed to genuinely narrow the class of death-eligible murders. Even if we agreed with the district court that such allegations were "bald" or "general," we find that they are substantively the same claim as that made to us. We do not require word-for-word replication of the state claim in the *habeas corpus* petition in order to address the merits therein, only that the petitioner "fairly present" the substance of each of his federal constitutional claims to the state courts. *See Hannah v. Conley*, 49 F.3d 1193, 1196 (6th Cir. 1995); *Levine v. Torvik*, 986 F.2d 1506, 1516 (6th Cir. 1993). "A petitioner 'fairly presents' his claim to the state courts by citing a provision of the Constitution, federal decisions using constitutional analysis, or state decisions employing constitutional analysis in similar fact patterns." *Id*. at 1196 (citing *Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir.1987)). We believe that Carter has met these requirements by asserting in his state post-conviction petitions that the statute failed to narrow the class of persons eligible for the death penalty in violation of his Eighth Amendment rights. We therefore turn to the merits of his claim.

Under applicable Tennessee law, aggravating circumstances are present if "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann.

nor did Morrell or Shell ask for his independent recollection of events.

We recognize that "photo identification procedures require close scrutiny and . . . must be conducted carefully to ensure the reliability of eyewitness in-court identification." *United States v. Tyler*, 714 F.2d 664, 665 (6th Cir. 1983). This Court, however, has upheld a number of photo identifications when they contain other indicators of reliability. *See, e.g., United States v. Monsour*, 893 F.2d 126 (6th Cir. 1990) (photo array plus prior independent description of suspect); *United States v. Causey*, 834 F.2d 1277 (6th Cir. 1987) (single photo identification plus prior independent description of suspect's car); *Smith v. Perini*, 723 F.2d 478 (6th Cir. 1983) (photo array, in-person show-up, plus prior independent description); *United States v. Tyler*, 714 F.2d 664 (6th Cir. 1983) (two separate photo arrays plus detailed description).

We find that sufficient indicia of reliability of Garber's identification exist in spite of the improper photo identification procedure. Garber testified that he viewed Carter and Price at the rest stop for as long as an hour. He saw them standing in a well-lighted area only thirty to thirty-five feet from where Garber was cleaning the lobby. Garber stated that he focused on Carter's and Price's faces while he was watching them because he was concerned they might be suspects in the recent thefts at the rest stop. Although he could not place the date of his sighting, Garber was certain that he had seen Carter, Price and Lile together at the rest stop. We agree that this is a difficult question, but find that the above facts dictate that Garber's in-court identification was reliable. We therefore affirm the district court's determination that the use of this identification did not violate Carter's due process rights.

## VII.

Carter asserts that the Tennessee statute defining aggravating circumstances is unconstitutionally vague because it could be construed to include all murders, as all murders involve the elimination of the victim as a potential

defense strategy was the same at the sentencing phase: to show that Price's testimony was not sufficiently reliable to establish an aggravating circumstance. Both Beier and Seals testified that the alternative premeditated and felony-murder theories set out in Count I of the indictment presented a problem to the defense in interpreting the jury's general verdict of guilty at the guilt phase. They agreed that there was at least a 50% chance that the jury had already found at least one aggravating circumstance when it returned its general verdict at the guilt phase.

The only evidence on the standard for reasonably effective counsel in Tennessee in 1984 which was presented at the federal evidentiary hearing was that of Carter's expert, Charles W.B. Fels, a former Tennessee Assistant District Attorney General, a former Assistant U.S. Attorney and an experienced defense counsel. He had lectured on criminal defense in over a dozen states, at the FBI Academy in Quantico, Virginia, and at the National Criminal Defense College in Macon, Georgia; served on the Board of the National Association of Criminal Defense Lawyers; and prepared and tried capital cases as both a state prosecutor and a defense attorney. Although he had not conducted a sentencing hearing defense, he had prepared sentencing phase cases as both a prosecutor and defense counsel.

The district court found Fels to be qualified to testify as an expert on the standard for reasonably effective counsel in investigation, preparation, and presentation of a defense at the sentencing phase of a Tennessee capital trial. Fels testified that it was customary for defense co-counsel to divide pretrial investigation into guilt and sentencing phase issues and for one attorney to be responsible for each. According to Fels, it was also customary to obtain the defendant's educational, family, social, court, medical, prison, and similar records, and to interview the defendant's family members to search for potential statutory and non-statutory mitigating circumstances evidence. Fels testified that the sentencing phase investigation performed by reasonably effective counsel

required approximately the same amount of time as guilt phase investigation and preparation.

Fels also testified that reasonably effective counsel did not rely solely on the defendant to lead them to mitigating circumstances evidence since the defendant might be unable to recognize and identify such evidence. Fels confirmed that a capital case in Tennessee is really two separate trials, guilt and sentencing, and that the sentencing phase is a unique proceeding at which very different rules apply. Fels testified that trial counsel could not make reasonable strategic decisions regarding presentation of a sentencing defense until a reasonable investigation had been completed. He also testified that, under the specific facts of this case, counsel could not make a reasonable strategic decision to forgo presentation of available mitigating circumstances evidence in the face of a probable mandatory death sentence. Based on all these factors, Fels concluded that trial counsel did not offer effective assistance in the investigation, preparation, and presentation of a sentencing defense in this case.

Defense investigator and paralegal Donna Toth testified that, as part of Carter's *habeas corpus* case, she was able to compile a detailed family history through interviews with Carter's family members in the Morristown area. Toth testified that she had been able to amass a significant volume of family, social, medical, psychological, military, and legal records regarding Carter through the use of a written records release. Three members of Carter's family testified: Carter's aunt, Hazel Jinks; Carter's second cousin, Terri Jinks; and Carter's sister, Betty Jean Holt. All three lived in the Morristown area in November 1984 but none were contacted by trial counsel. All three stated that they would have been willing and able to testify on Carter's behalf if asked to do so.

After allowing the parties an opportunity to submit proposed Findings of Fact and Conclusions of Law, the magistrate judge issued a report and recommendation finding that trial counsel had not been deficient in failing to conduct an investigation into potential mitigating circumstances

procedure is so 'impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). The paramount issue is whether the suggestiveness so undermines the reliability of the identification as to offend due process. *See Foster v. California*, 394 U.S. 440 (1969). We look to the reliability of the identification in determining its admissibility; if an identification is reliable, it will be admissible even if the confrontation procedure was suggestive. *See Manson*, 432 U.S. at 114; *Biggers*, 409 U.S. at 199. Following *Biggers,* we consider the following factors in evaluating reliability: 1) the opportunity of the witness to view the defendant at the initial observation; 2) the witness' degree of attention; 3) the accuracy of the witness' prior description of the defendant; 4) the level of certainty shown by the witness at the pretrial identification; and 5) the length of time between the initial observation and the identification. 409 U.S. at 199-200. The degree of reliability of the identification, as indicated by the above-stated factors, is to be considered in light of the degree of suggestiveness of the identification procedure and of the totality of the circumstances in determining whether due process requires suppression of the identification. *See Manson*, 432 U.S. at 113-14.

We find that the Garber photo identification was suggestive. In July of 1984, Garber knew that the officers were investigating a homicide related to the Interstate 81 rest stop. Garber was shown only the pictures of the two suspects and the victim in the photographic equivalent of the widely-condemned show-up identification. *See Simmons*, 390 U.S. at 383 ("This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized."); *Stovall v. Denno*, 388 U.S. 293 (1967). Garber was not asked to describe any suspicious persons at the rest stop in February 1984 before being shown the photos,

that the officers were investigating a homicide.[3]   Garber indicated that he had seen the three individuals together at the rest stop but could not say which night, nor could he identify the vehicles shown in the photos.  On cross-examination, Morrell admitted that he did not ask Garber to independently describe the individuals prior to showing him the suspects' photos and that Garber could not describe the clothing worn by the three persons shown in them.

Garber testified at the suppression hearing that he worked at the rest stop in February of 1984 as a caretaker and maintenance man.  Garber was unable to recall how long he had observed the two men he identified as Price and Carter and, when pressed by the court, guessed that they were at the rest stop for at least an hour.  Garber could not recall what the men were wearing, nor could he specify which of the two got into the truck with Lile.  On cross-examination, Garber reiterated that he could not be more specific about the date when he saw the three men at the rest stop other than that "it was yet cool weather."  At the time, Garber was inside the rest stop lobby and viewed the men through its glass windows while cleaning the lobby.  Shell confirmed that Garber was not shown a mug book or photos of anyone other than Price, Carter, and Lile.

The Due Process Clause prohibits the use of identifications which under the totality of the circumstances are impermissibly suggestive and present an unacceptable risk of irreparable misidentification.  *See Manson v. Brathwaite*, 432 U.S. 98 (1997); *Neil v. Biggers*, 409 U.S. 188 (1972).  "A conviction based on identification testimony following pretrial identification violates the defendant's constitutional right to due process whenever the pretrial identification

---

[3]Respondents assert that Garber testified that when he first spoke with the investigators and looked at the photographs he did not know that they were investigating a murder, but only that they were checking "about something that happened at the rest area."  However, Morrell testified that he told Garber he was investigating a homicide before he showed Garber the photos.

evidence.  The magistrate judge found that, since the State could rebut any mitigating circumstances evidence with proof of Carter's alleged bad character, prior bad acts, and criminal convictions, there was no prejudice from any ineffective assistance of counsel at sentencing.  Carter filed objections to the magistrate judge's report and recommendation and submitted a brief in support of those objections.

In January 1995, Carter filed a third post-conviction petition for relief from judgment in the state courts.  On April 4, 1995, the federal magistrate judge filed a report and recommendation concluding that the claims of ineffectiveness of counsel should be dismissed.  Because Carter's third post-conviction petition in state court was still pending, the district court dismissed the federal *habeas* case for failure to exhaust state remedies.  The Tennessee Supreme Court ultimately affirmed the denial of relief on Carter's third state petition.  *See Carter v. State*, 958 S.W.2d 620 (Tenn. 1997).  On May 21, 1998, this Court filed a *per curiam* opinion vacating the district court's order and remanded the case for determination of Carter's claims on the merits.  *See Carter v. Bell*, No. 97-6096, 1998 WL 279361 (6th Cir. May 21, 1998).

On January 29, 1999, the district court entered an order adopting and approving the magistrate judge's report and recommendation, stating additional findings, and denying Carter's claims regarding ineffectiveness of counsel.  In its Memorandum accompanying the order, the district court found that trial counsel's performance was deficient in their failure to investigate, discover, and present mitigating evidence at the sentencing hearing.  However, the district court went on to find that, had such evidence been admitted, it would have opened the door to unlimited bad character evidence and, therefore, would not have made a difference in the outcome of the sentencing hearing. The district court also granted a certificate of probable cause.  On February 26, 1999, Carter filed this timely appeal.

## II.

We review *de novo* the district court's disposition of a petition for writ of *habeas corpus*, but we review the district court's factual findings only for clear error. *See McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir.1996). In the context of *habeas corpus* petitions, we must defer to state court factual findings, according them a presumption of correctness that the petitioner may rebut only with clear and convincing evidence. *See id.* However, that "presumption only applies to basic, primary facts, and not to mixed questions of law and fact." *Id.* We review a mixed question of law and fact *de novo.* *See Rickman v. Bell*, 131 F.3d 1150, 1153 (6th Cir. 1997).

As a federal court reviewing a state criminal judgment, we do not consider a state court conclusion that counsel rendered effective assistance to be a finding of fact binding on us. *See Strickland v. Washington*, 466 U.S. 668, 698 (1984). "Ineffectiveness is not a question of 'basic, primary, or historical fac[t.]'" *Id.* (citations omitted). We recognize that the Supreme Court has found that "both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Id.* A claim of ineffective assistance of counsel presents a mixed question of law and fact; therefore both the state court and district court determinations are subject to *de novo* review by this court. *See Rickman*, 131 F.3d at 1153; *Sims v. Livesay*, 970 F.2d 1575, 1579 (6th Cir.1992). Allegations of violations of *Brady v. Maryland*, 373 U.S. 83 (1963), present mixed questions of law and fact which this Court reviews *de novo.* *See Norris v. Schotten*, 146 F.3d 314, 334 (6th Cir. 1998); *United States v. Phillip*, 948 F.2d 241, 249-50 (6th Cir. 1991).

We apply these standards in light of the fact that Carter filed his petition for *habeas* review prior to the enactment of the Antiterrorism and Effective Death Penalty Act, Pub.L.No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). While we still defer to the state courts' factual determinations, we are permitted greater

we find that the district court properly granted summary judgment on this claim.

## VI.

Carter argues that the Garber photo identification procedure was so impermissibly suggestive that Garber's in-court identification should have been suppressed. The State contends that in light of the totality of the circumstances supporting the reliability of Garber's identification, Carter's constitutional rights were not impinged. On direct appeal, the Tennessee Supreme Court concluded that the procedure satisfied the due process analysis of *Neil v. Biggers*, 409 U.S. 188 (1972). *See Carter*, 714 S.W.2d at 248-49. The court found that even assuming that the identification procedure used by Tennessee police officers was suggestive, "the procedure did not give rise to a substantial likelihood of irreparable misidentification and that under the totality of the circumstances, the in-court identification was reliable and independent of any previous suspect identification." 714 S.W.2d at 249. The district court also rejected Carter's claim. Accepting the Supreme Court of Tennessee's factual findings, the district court held that the photo identification procedure used with Garber did not undermine the independence and reliability of his subsequent in-court identification of Carter and therefore did not encroach on Carter's due process rights.

In this case, a hearing on Carter's motion to suppress the Garber identification was held on November 7, 1984. At the hearing, Tennessee Bureau of Investigation Agent Rick Morrell, Tom Shell of the District Attorney General's Office and Garber testified. Morrell stated that he and Shell first interviewed Garber some five months after Lile's abduction and murder. At that initial interview, Morrell and Shell showed Garber ten photographs of Price, Carter, Lile, Carter's Chevrolet Chevette, and Lile's GMC pickup. Garber was told

The district court agreed with the Tennessee Supreme Court, noting that the record contained sufficient proof to establish that Carter was guilty of larceny and kidnapping, but not of robbery, since there was no evidence to show that Carter had robbed Lile prior to killing him. The district court concluded that any error which did occur was harmless and had no substantial or injurious impact upon the jury's verdict.

The Supreme Court has indicated that "[t]o render a defendant eligible for the death penalty . . . the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase." *Tuilaepa v. California*, 512 U.S. 967, 971-72 (1994); *see Lowenfield v. Phelps*, 484 U.S. 231, 244-46 (1988). Moreover, the elements of the aggravating circumstance "may be contained in the definition of the crime or in a separate sentencing factor (or both)." *Tuilaepa*, 512 U.S. at 972; *see Lowenfield*, 484 U.S. at 244-46. Thus, if the jury is instructed on the statutory elements of underlying crimes pertaining to aggravating circumstances, there is no constitutional difference whether the instructions are given at the guilt phase or the sentencing phase. We are aware of no authority stating that the Eighth Amendment requires the trial court to restate the elements of underlying felonies advanced as aggravating circumstances at the sentencing phase where the same jury remains impaneled and the sentencing phase so closely follows the guilt phase of the trial.

Upon close review, Carter's argument would constitute a new rule of Eighth Amendment law. A new rule of constitutional law should not be applied on collateral review in a federal *habeas corpus* case unless to do so would satisfy the narrow exceptions of decriminalizing a class of conduct or prohibit infliction of capital punishment on a particular class of persons, or devising a new rule which is a "watershed rule of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle v. Parks*, 494 U.S. 484, 485, 494-95 (1990). None of these exceptions apply here. Accordingly,

latitude in examining the proceedings than is permissible under AEDPA governed cases. *See Williams v. Taylor*, 120 S.Ct. 1495 (2000) (applying the stricter AEDPA standard to petitions filed after April 24, 1996).

### III.

To establish a violation of the Sixth Amendment right to effective assistance of counsel, a defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness and that the defendant was prejudiced by the ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Representation is deficient when "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." 466 U.S. at 687. In considering the second, "prejudice" factor, the *Strickland* Court noted that even professionally unreasonable errors "do . . . not warrant setting aside the judgment of a criminal proceeding if the error[s] had no effect on the judgment." *Id.* at 691. Moreover, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 693-94. We note that the Supreme Court has determined that its later decision in *Lockhart v. Fretwell*, 506 U.S. 364 (1993), "do[es] not justify a departure from a straightforward application of *Strickland* when counsel's ineffectiveness deprives the defendant of a substantive or procedural right to which the law entitles him." *Williams*, 120 S.Ct. at 1497. This Court has regularly applied the *Strickland* standards in *habeas corpus* cases. *See, e.g., Rickman*, 131 F.3d at 1155; *Groseclose v. Bell*, 130 F.3d 1161, 1168 (6th Cir. 1997).

Carter argues that his trial counsel were ineffective in two ways: by failing to investigate his background for mitigating evidence, and by consequently failing to introduce at the sentencing hearing the mitigating evidence which proper investigation would have discovered. Carter maintains that

his counsel's failure to discover and present such mitigating evidence at sentencing was unreasonable, given that the presentation of mitigating factors would have humanized him before the jury such that at least one juror could have found he did not deserve the death penalty.

Under Tennessee law at the time of Carter's trial, no death penalty could be imposed absent an unanimous finding that one of the following statutory aggravating circumstances existed: the murder was committed against a person less than twelve years of age; the defendant was previously convicted of one or more felonies which involved the use or threat of violence; the defendant knowingly created a great risk of death to two or more persons other than the victim during his act of murder; the defendant committed the murder for remuneration; the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; the murder was committed while the defendant was engaged in committing another felony; the murder was committed by the defendant while he was in lawful custody or during his escape from lawful custody; the murder was committed against any peace officer, corrections official, corrections employee or fireman who was engaged in the performance of his duties and defendant knew that the victim was so engaged; the victim was a judge, district attorney, or attorney general; the murder was committed against an elected official due to that official's lawful duties or status; or the murder was part of a mass murder. *See* Tenn. Code Ann. 39-2-203(i) (1982)(repealed 1989).

The same law listed eight categories of statutory mitigating circumstances, but noted that these were non-inclusive: no significant history of prior criminal activity; defendant was under the influence of extreme mental or emotional disturbance; victim was a participant in the defendant's conduct or consented to the act; the defendant reasonably believed to have moral justification for his conduct; defendant acted under extreme duress or under the substantial

## V.

Carter argues that the trial court failed to re-instruct the jury at the sentencing phase as to the statutory elements of the felony offenses relied upon to establish the felony murder aggravating circumstances, asserting that the trial court's failure to repeat at the sentencing phase instructions given less than twenty-four hours earlier at the guilt phase was such a fundamental error that it cannot be harmless. The State notes that Carter does not point to any authority supporting an Eighth Amendment requirement that the trial court at the sentencing phase reiterate instructions already given to the jury.

The trial court charged the jury as to the elements of kidnapping, robbery, and larceny as underlying felonies, and did so late on the afternoon of November 13, 1984, just before the jury began deliberations on the guilt phase. The next day the court conducted the sentencing phase, and the jury returned its verdict at 11:31 a.m., finding as one of the aggravating circumstances that "the murder was committed while the defendant was engaged in committing larceny and kidnapping," but not robbery.

On direct appeal, the Tennessee Supreme Court ruled that any error in failing to recharge the jury at the sentencing phase was harmless, because the trial court had sufficiently instructed the jury at the guilt phase, less than 24 hours earlier, and because circumstances clearly indicated that the jury continued to follow those instructions in its sentencing determination. *See Carter*, 714 S.W.2d at 250. The Tennessee Supreme Court found it significant that even though the jury had been given the complete statutory definition of larceny, robbery and kidnapping the day before, the jury had eliminated robbery from its final determination of the applicable aggravating circumstances on the day of sentencing. "This demonstrates that the jury had clearly in mind the elements necessary to convict of the crime of the felony of robbery and quite properly declined to include it." *Id*.

domination of another person; youth or advanced age of the defendant at the time of the crime; or the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication. *See* Tenn. Code Ann. 39-2-203(j) (1982)(repealed 1989).

The district court found that trial counsel's failure to investigate, discover, and present mitigating evidence in the face of a probable mandatory death sentence constituted deficient performance under *Strickland*. However, the district court found that Carter was not prejudiced by these omissions, concluding that the introduction of mitigating evidence by Carter would open the door to any conceivable evidence of bad character in rebuttal.[1]

In Carter's evidentiary hearing before the Magistrate Judge, he presented evidence of mitigating circumstances that he alleged his trial counsel should have presented at sentencing, including assertions of illegitimacy, extreme childhood poverty and neglect, family violence and instability during childhood, poor education, mental disability and disorder, military history, and positive relationships with step-children, adult family, and friends. We summarize this evidence here.

---

[1]Petitioner's extensive criminal record, which includes both state and federal convictions, contains the following: burglary and larceny (1963); first and third degree burglary (1968); mail theft (1974); third degree burglary, attempt to pass a forged instrument, escape, and larceny from the person (1977); three counts of armed robbery and one count of assault with intent to commit armed robbery (1984).

Trial counsel were also familiar with Petitioner's other acts of misconduct which had not resulted in criminal charges. Respondents point to claims that he physically assaulted his former wives; struck his step-daughter; stabbed a fellow inmate in a dispute over a trivial matter while incarcerated awaiting trial on the current murder charge; and attacked Price during a break in another trial in which Price was also testifying against him.

The evidence shows that Carter grew up in a poor and troubled household. Carter was the second of Madge Carter's nine children. These children had five different fathers, only one of whom Madge Carter married. One sibling died in a house fire set by one of Madge's live-in boyfriends. Two others died from birth defects as infants. All of the remaining six have criminal records. Carter's mother and sister were both hospitalized in mental health institutions. His grandfather, father, mother, step-father, and brother all suffered from alcoholism, though Carter has never abused alcohol or used illegal drugs. Carter's family was extremely poor during his childhood, with no electricity, running water, or indoor plumbing. The family diet consisted primarily of white beans and cornbread and the children wore used clothing donated by the welfare department. The family never celebrated the children's birthdays, Christmas or other holidays.

All the evidence demonstrates that Carter's childhood home was violent and unstable. There were frequent fistfights between family members and visitors, excessive drinking, gambling, and consistent manufacture and sale of "homebrew." Carter's mother was beaten by her father, Carter's grandfather, for becoming pregnant with one of Carter's half-siblings; Carter's father, whom his mother never married, physically assaulted her. Carter's sister states that the family never lived in one place more than two years, moving on to avoid the welfare department, and says it was not uncommon for their mother to drink up her welfare check and the children to go hungry.

Carter's mother was arrested on several occasions for public intoxication, manufacture of moonshine and child neglect. At the age of three, Carter and his then five year old sister were abandoned by their mother for more than a week, subsisting on milk stolen from the neighbors' porches. The welfare department placed the two in a children's home for several weeks. They subsequently lived with their aunt until their mother regained custody a year later.

disagreed, concluding that events that occurred during Price's military tenure in the 1960's were too remote in time to be of any probative value regarding Price's credibility in 1984. *See* Tenn. R. Evid. 608(b) and 609(b); Fed. R. Evid. 608(b) and 609(b); *State v. Morgan*, 541 S.W.2d 385, 388 (Tenn. 1976).

Price was on active military duty from 1963 to 1967. In Price's deposition, he admitted to receiving disciplinary action for stateside absences without leave and for drinking episodes. None of the offenses for which Price may have been disciplined in the Army meet the criteria of Tennessee's evidence rules regarding impeachment of witnesses by prior bad acts or convictions: they are not probative of truthfulness or untruthfulness, nor did they occur within the preceding ten years . *See Morgan*, 541 S.W.2d at 388 (adopting Fed. R. Evid 608(b) and 609(b)).

During trial, Carter's counsel used Price's six felony convictions for forgery, larceny, and assault with intent to commit murder to impeach Price's credibility. *See Carter*, 714 S.W.2d at 244. In light of that impeachment evidence, we do not see how evidence of unspecified, 17-year-old military discipline would have been material to Carter's case. We find that the district court correctly concluded that Price's military disciplinary record would not have provided material impeachment evidence for Carter because of its staleness and its lack of probative value.

Carter also claims that the prosecution should have disclosed that Price was institutionalized at Eastern State Psychiatric Hospital in 1969. The district court rejected Carter's claim, finding it too remote in time from the 1984 murder and trial to be material on any issue. Carter does not demonstrate that the information concerning Price's hospitalization at Eastern State was in either actual or constructive possession of the prosecution prior to or during the trial. Carter has not alleged or shown any facts indicating that the prosecuting attorney knew or should have known that such information existed. Because Carter failed to show that

was available to him from another source.  *See Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998); *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991).

We note that it is clear that Carter's counsel was aware that Price was testifying in exchange for a plea agreement which would allow Price to plead guilty to the lesser included offense of second degree murder in exchange for a sentence of thirty five years, with eligibility for parole in fourteen years.  The record also shows that Price had reached an agreement with Grainger County authorities by which he would receive a thirty-five year sentence for armed robbery, and there was a distinct possibility this sentence would run concurrently with his sentence in the Lile murder.  This information was brought before the jury during cross-examination of Price.

Carter presents the discussion between trial counsel and the State as to whether there was an agreement for Price to serve time in state or federal prison.  While the record shows some confusion as to whether such an agreement existed, Carter does not demonstrate how this misrepresentation, if any actually existed, was a suppression of material evidence.

We agree with Carter that Price is critical to the prosecution's case.  Had the fact that Price entered into a plea agreement not been disclosed at all, we would agree that a *Brady* violation had occurred.  *See Schledwitz,* 169 F.3d at 1011.  But on these facts, there is no indication that the jury would have returned a different verdict had they been informed of an agreement as to where Price would be serving his sentence.  Trial counsel argued the elements of Price's plea agreement to the jury during closing arguments at both the guilt and sentencing phases, with counsel asserting that Price had saved himself from a first degree murder conviction and a death sentence by testifying for the state.  On these facts, we fail to find materiality.

Carter next asserts that he was denied impeachment evidence when the prosecution failed to disclose Price's military disciplinary record from the 1960s.  The district court

Carter suffered seriously from childhood rheumatic fever.  He was whipped and beaten as an infant for crying from the illness.  Carter also suffered frequent serious breathing problems as a child that led to numerous trips to the emergency room.  The records show both childhood and adult head injuries from accidents and fights. Carter was diagnosed with diabetes in 1977, when he apparently was brought to the hospital in a coma.

Carter received limited schooling at best.  The records of the Hamblen County school system show only very sporadic attendance for a few months in the second and sixth grades, and no other educational records were located.  There is some evidence to show that Carter attended a portion of the ninth grade when the family lived in Indiana.  Carter's IQ tested in the borderline mentally retarded range in 1992, with a score of 79; a Beta IQ test from 1984 showed an IQ of 87, placing Carter in the 19th percentile at the time of his trial.

In October of 1984, shortly before his trial, a Tennessee Department of Corrections physician recommended that Carter be considered for psychiatric hospitalization and noted that his nerves seemed stretched to the breaking point.  Carter was diagnosed as schizophrenic by Tennesse Department of Corrections psychiatrists in 1991.  Dr. Pamela Auble, a clinical psychologist, evaluated Carter in 1992 and determined that he had psychotic symptoms involving hallucinations, paranoid delusions, and thought disorders consistent with paranoid schizophrenia or an organic delusional disorder.  She noted that Carter had asserted that other people had been controlling his mind, playing audio programs which screamed at him at all times, and that these programs could follow him wherever he went. She also found that he had a history of partial seizures. Dr. Auble stated that although Carter may not have appeared delusional to a lay-person at the time of his trial, a trained professional would have been able to recognize mental compromise and abnormal personality traits in excess of an antisocial personality disorder.  Dr. Auble identified several instances prior to November 1984 when Carter was recommended for

psychiatric or psychological counseling, received medication for his "nerves," exhibited paranoid ideas or behavior, or suffered hallucinations or delusions.

Carter was married twice prior to 1984 and had stepchildren from each marriage.  His stepchildren state that their relationships with him were positive.  In addition to his stepchildren, Carter had good relationships with several of the other children in his life.  These include his niece, Terri Jinks, who was 11 years old in 1984.  Ms. Jinks testified that Carter replaced the locks on their door and bought groceries for her after neighbors broke into her mother's apartment and stole their food.  He also bought clothes and shoes for Ms. Jinks and sent her cards and photos.

Carter served for a period of approximately six months in the Indiana National Guard in 1961.  He was given an honorable discharge, due at least in part to his low intelligence and inaptitude for the service.

At the evidentiary hearing, Carter presented this evidence to show mitigating circumstances which he alleged would have influenced the jury to grant a lesser penalty.  In light of this evidence, we look to the law on the introduction of mitigating factors at sentencing in capital cases.  The Eighth and Fourteenth Amendments to the United States Constitution dictate that the sentencer in a capital case may not be precluded from considering any relevant circumstance as a mitigating factor.  *See Mills v. Maryland*, 486 U.S. 367, 371 (1988).   "The Constitution requires States to allow consideration of mitigating evidence in capital cases.  Any barrier to such consideration must therefore fall."  *McKoy v. North Carolina*, 494 U.S. 433, 442 (1990).  "Whatever the cause, . . . the [sentencer's] failure to consider all of the mitigating evidence risks erroneous imposition of the death sentence."  *Id.*  Mitigating evidence includes "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  *Lockett v. Ohio*, 438  U.S. 586, 604 (1978).  Further, states cannot infringe upon the court's

information was of no use to him, related to incidents too remote to be material or was of questionable reliability. The district court also found that Price had testified that no such agreement had been made, and that the other aspects of Price's plea bargain were presented to the jury.

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir. 1994). Even absent a specific *Brady* request, the prosecution must disclose exculpatory evidence that, when viewed in the context of the entire record, "creates a reasonable doubt that did not otherwise exist." *United States v. Agurs*, 427 U.S. 97, 112 (1976).  "[I]t is well settled that this disclosure obligation includes evidence that could be used to impeach the credibility of a witness." *Schledwitz v. United States*, 169 F.3d 1003, 1011 (6th Cir. 1999).

To establish a violation of *Brady*, the petitioner has the burden of establishing that the prosecutor suppressed evidence; that such evidence was favorable to the defense; and that the suppressed evidence was material. *See Moore v. Illinois*, 408 U.S. 786, 794-95 (1972).  The inquiry is objective, independent of the intent of the prosecutors. *See Brady*, 373 U.S. at 87.

This Court has recognized that "*Brady* is concerned only with cases in which the government possesses information which the defendant does not." *See Mullins*, 22 F.3d at 1371. Further, there is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information

reasonable probability that a jury would have returned the same sentence had the evidence been introduced.

The sentencing phase of the trial under Tennessee law is obviously a critical stage of the criminal proceeding which can result in the sentence of death and did so in this case. Yet Carter's lawyers performed no investigation to prepare a defense. They presented no meaningful evidence by way of mitigation as a result of their failure to investigate and prepare, not as a result of trial strategy after thorough research. It is not just that the defense presented on Carter's behalf at the sentencing phase was ineffective; rather, Carter's attorneys did not even attempt to present a defense at the sentencing phase. We find that there is prejudice to Carter from the failings of his trial counsel, and we therefore reverse the portion of the district court's decision which found no ineffective assistance of counsel at the sentencing phase of his trial. For this reason, we do not need to determine whether trial counsel's failure to investigate mitigating circumstances constituted deficiencies so severe as to dispense with the need to establish prejudice.

## IV.

Carter argues next that the State violated its obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose evidence favorable to the defense by not divulging that (1) Price had sought federal confinement as part of his plea agreement; (2) Price had been hospitalized for mental illness in 1969 and had been disciplined while in the military in 1967; and (3) a state doctor had recommended that Carter be institutionalized due to mental problems three weeks before trial. Carter also claims that the prosecutor represented to the trial court and counsel that Price's plea bargain contained no government agreement to assist in placing Price in a federal prison facility designed for witness protection, when in fact such an agreement was understood. Carter maintains that this information was important impeachment evidence. The State contends that such information was immaterial. The district court rejected Carter's claims, stating that either the sought

consideration of any relevant circumstance that may deter the imposition of the death penalty. *See McClesky v. Kemp*, 481 U.S. 279, 306 (1987). The Supreme Court recently noted that "it is undisputed that [the petitioner] had a right – indeed, a constitutionally protected right – to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer." *Williams*, 120 S.Ct. at 1513.

As the exclusion of mitigating evidence potentially undermines the reliability of sentencing determinations, the burden is on the state to prove that the error was harmless beyond a reasonable doubt. *See Satterwhite v. Texas*, 486 U.S. 249, 258 (1988); *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986); *Chapman v. California*, 386 U.S. 18, 24 (1967). The Tennessee Supreme Court has specifically reiterated the importance of the sentencer "hearing evidence about the defendant's background, record, and character and any circumstances about the offense that may mitigate against the death penalty." *State v. Cauthern*, 967 S.W.2d 726, 738 (Tenn. 1998).

It is clear to us that trial counsel's performance was deficient under the first part of the *Strickland* test. In *Williams*, the Supreme Court found that trial counsel's representation of the petitioner during the sentencing phase fell short of professional standards when:

> The record establishes that counsel did not begin to prepare for that phase of the proceeding until a week before trial. They failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood . . . . Had they done so, the jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social service bureau for two years during his parents' incarceration . . . .

Counsel failed to introduce available evidence that Williams was "borderline mentally retarded" and did not advance beyond sixth grade in school.

*Williams*,  120 S.Ct. at 1514 (internal citations omitted).

In *Mapes v. Coyle*, 171 F.3d 408, 426 (6th Cir. 1999), this Court noted that "when a client faces the prospect of being put to death unless counsel obtains and presents something in mitigation, minimal standards require some investigation." Moreover, in *Rickman*, this Court found deficiencies so severe as to dispense with the need for a showing of prejudice under *Strickland*. 131 F.3d at 1157. The Court noted that trial counsel "did not interview any witnesses, conduct any legal research, or obtain and review any records, including those regarding [petitioner's] employment, education, mental health, social services contacts, military service, or prison experience." *Id.* Further, trial counsel's trial preparation "consisted solely of interviews he conducted with [the petitioner]." *Id.* Although we note that, unlike *Rickman*, there was no hostility on the part of trial counsel in this case, we find that *Rickman* stands for the relevant proposition that the complete failure to investigate, let alone present, existing mitigating evidence is below an objective standard of reasonable representation, and may in fact be so severe as to permit us to infer prejudice.

In *Groseclose v. Bell*, this Court considered a Tennessee case in which trial counsel "almost entirely failed to investigate the case; he never, for example, interviewed the crime-incident witnesses or any family members." 130 F.3d 1161, 1166 (6th Cir. 1997). In *Groseclose*, trial counsel failed to present mitigating evidence during the sentencing stage of the proceedings. Among other things, trial counsel failed to present the defendant's military record, religious and volunteer activities, or experts who could testify about sociological or psychological factors. *See id.* Under these circumstances, the Court found the representation was objectively unreasonable. *See id.* at 1170-71.

mitigating factor actually presented. *See Bates,* 804 S.W.2d at 881-81; *Cozzolino,* 584 S.W.2d at 767; *Teague,* 645 S.W.2d at 399. As Tennessee law clearly establishes, the State's demonstration of a defendant's present criminal proclivities is not relevant to the defendant's attempt to show the origin in a troubled childhood of the defendant's criminal acts. *See Cozzolino*, 584 S.W.2d at 768. We therefore find that *Scott* does not govern the result in this case.[2]

In considering this case, we note carefully the Supreme Court's finding in *Williams* that the presence of juvenile records of the petitioner which were not favorable did not justify "the failure to introduce the comparatively voluminous amount of evidence that did speak in [petitioner's] favor". 120 S.Ct. at 1514. The Court found that "the graphic description of [petitioner's] childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." *Id.* at 1515 (citing *Boyde v. California*, 494 U.S. 370, 387 (1990). The Supreme Court concluded that "[m]itigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Id.* at 1516.

Like *Williams*, Carter has presented substantial evidence of a childhood in which abuse, neglect and hunger were normal. In light of the quantity of mitigation evidence available, and the limits discussed above on what the State could introduce in rebuttal, we find ourselves unpersuaded that there is a

---

[2]We note that *Scott* predated the Supreme Court's decision in *Williams* by approximately two weeks. As *Williams* contains substantial language concerning the generally prejudicial nature of trial counsel's failure to research and present mitigating evidence in death penalty sentencing, we find that *Williams* may limit *Scott* to the narrow facts of a federal court contemplating a *habeas* petition after a state court has conducted an evidentiary hearing and made a finding of fact that had mitigating evidence been introduced, the defendant's recent criminal history would have been presented to the jury in rebuttal.

positive relationships with children. Merely because Carter has a lengthy criminal record hardly serves to "explain or controvert" these factors. *Cozzolino*, 584 S.W.2d at 768. No reason has been shown that a Tennessee trial court would allow such evidence in a capital sentencing hearing. Hence, the district court's conclusion ignored the proper scope of rebuttal evidence under Tennessee law. In doing so, the district court erroneously concluded that Carter had not shown he had suffered any prejudice from the missing mitigation evidence.

We distinguish this Court's recent decision in *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000), on this point. In *Scott*, this Court determined that the defendant could not show prejudice under *Strickland* when "the mitigating circumstances [defendant] wishes his counsel had presented . . . are largely, even overwhelmingly, negated by evidence that his background includes commission of robbery, assault, kidnapping, and other violent acts upon innocent citizens, and that prosecutors would have elicited such information from any family members who testified for [defendant]." 209 F.3d at 880. In *Scott*, however, unlike this case, the Ohio Court of Common Pleas had conducted an evidentiary hearing on the issue of the ineffectiveness of counsel in failing to present mitigating evidence, and had concluded that "had [defendant] chosen to have a pre-sentence investigation report prepared or had the family members testified, the jury would have learned of [defendant's] extensive criminal history." *Id.* at 880. Upon *habeas* review, this Court gave deference to this conclusion, and therefore held that the defendant could not establish prejudice, noting that "unlike in *Austin* . . . these lawyers had a credible reason for not presenting testimony: a desire to keep [defendant's] extensive criminal history from the jury." *Id.* at 881.

Here, no state evidentiary hearing was ever held on this issue. More importantly, however, is the Tennessee evidentiary law on relevancy during sentencing, which, unlike the Ohio law in *Scott*, limits the introduction by the prosecution to negative evidence which is relevant to a

In *Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997), this Court held that the failure of trial counsel "to investigate and present any mitigating evidence during the sentencing phase so undermined the adversarial process that [defendant's] death sentence was not reliable." Relying on this Court's holding in *Glenn v. Tate*, 71 F.3d 1204, 1206-08 (6th Cir. 1995), that counsel provided ineffective assistance where information was not presented to the jury at sentencing because counsel made little attempt to prepare for the sentencing phase, the *Austin* court found that "given that several of [defendant's] relatives, friends, death penalty experts, and a minister were available and willing to testify on his behalf," failure to present any mitigating evidence "does not reflect a strategic decision, but rather an abdication of advocacy." *Austin*, 126 F.3d at 849.

In this case, trial counsel attempted at the evidentiary hearing to excuse their performance by claiming that Carter reacted violently to the idea of a mental health defense; Carter never volunteered any information about his family background or childhood; that there were no indications based on Carter's demeanor to support an argument based on mental defect; and that members of Carter's family were uncooperative. Counsel claimed that they were aware that Carter suffered from diabetes, but based on personal experience with other diabetics, they saw nothing about that condition that would be a credible mitigating factor for Carter. They also stated that Carter did not want to testify at the sentencing hearing. As a result, counsel did not further investigate any non-statutory mitigating factors.

Trial counsel testified that they were not aware of all the potential non-statutory mitigating evidence outlined above. Beier testified that, had he been aware of them, they would certainly have pursued them in pretrial investigation and, based on the results of that investigation, they would have made an informed decision on whether to offer such evidence at sentencing. Trial counsel testified that they were concerned about opening the door to Carter's substantial criminal record and other bad acts at the sentencing phase.

In his sentencing phase argument, Beier stressed that counsel's errors should not be held against Carter and presented a general plea for mercy. Although he alluded to Price's credibility and Price's plea to a thirty-five year sentence for second-degree murder, he did not suggest that these were non-statutory mitigating circumstances that should be weighed against any aggravating circumstances found by the jury, nor did he contend that the State had failed to meet its burden of proof to establish an aggravating circumstance. Counsel's theory was that even though the jury had convicted Carter at least in part on the basis of Price's testimony, there remained sufficient doubt about Price's credibility to prevent imposition of the death penalty. Attempting to keep Carter's extensive criminal history away from the jury, counsel argued that Carter was a victim of circumstances created by Price. Despite this theme, counsel did not request jury instructions on residual doubt about the credibility of Price or inequity in the Price and Carter sentences as potential non-statutory mitigating circumstances. Counsel's closing argument filled only six pages of written transcript, which required approximately six and one-half minutes to read aloud, much of it based on a plea to the jury to not hold the errors of Carter's counsel against Carter, and a discourse on the sacredness of all life, illustrated by a story of counsel's attempts to save baby birds who fell out of their nests.

While we understand the great burdens on appointed trial counsel in capital cases and the often limited financial support they receive for investigation and discovery, justice requires that counsel must do more than appear in court or argue to the jury. Trial counsel here did Carter a disservice by failing to investigate mitigating evidence. While counsel advanced several reasons for adopting their strategy, their reasons do not excuse their deficiency. The sole source of mitigating factors cannot properly be that information which defendant may volunteer; counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to their utility. We find that reluctance on Carter's part to present a mental health defense or to testify should not preclude counsel's investigation of these potential factors.

The court also held that evidence of prior escape and assault-and-battery convictions were relevant to one of the aggravating circumstances or was otherwise harmless. *See id.* The defendant argued that the prosecution improperly asserted that the jury should impose the death penalty due to the risk that the defendant would kill in prison or escape if given a life sentence. The Tennessee Supreme Court determined that as "the defense was molded around the theory that a life sentence was appropriate because the defendant was mentally disturbed to a degree that it lessened his culpability. . . . The State's argument was in direct response to defendant's mitigating theory and was not improper under the circumstances of this case." *Id.* at 881-82.

Carter acknowledges that *Bates* permits the admission of acts closely related to the offense of conviction and directly relevant to statutory mitigating circumstances, but argues that *Bates* does not permit the admission of all types of evidence as forecast by the district court. The State disagrees, asserting that *Bates* permits the presentation by the State of evidence relevant to specific deterrence and the future dangerousness of the defendant in order to rebut defense theories of lessened culpability due to mental condition and unfortunate social history.

We find that *Bates* is distinguishable. We read *Bates* as concerning a defense theory of reduced culpability due to mental defect at the time of the offense. Carter's proposed mitigating evidence does not relate to the circumstances of the crime; his evidence goes solely to establish the conditions of his childhood and development which he argues were the fundamental origin of his criminal acts. We find this evidence to be the same type analyzed in *Cozzolino*. We therefore hold that the State's evidence demonstrating Carter's criminal history does not controvert the mitigating factors presented, and is therefore not relevant.

Carter offered evidence of specific non-statutory mitigating factors such as his illegitimacy, family history, limited education, low and declining IQ, mental condition, and

In *State v. Bates*, 804 S.W.2d 868 (Tenn. 1991), the Supreme Court of Tennessee revisited the *Cozzolino* rule. After being sentenced to death for murder in connection with a car theft, the defendant in *Bates* objected to the admissibility of certain evidence at sentencing. The defendent objected to testimony that the defendant had cashed some of the victim's travelers' checks. The court ruled that although the evidence was introduced during the guilt phase, the evidence was relevant to sentencing because it both provided proof of an aggravating circumstance (robbery or larceny in connection with the murder), and because "evidence of [the defendant's] behavior shortly after the homicide would have been admissible in rebuttal to the mitigating evidence that defendant was suffering from a mental disease or defect, or extreme or emotional distress at the time of the offense." 804 S.W.2d at 879.

The defendant next objected to the testimony of a police officer who described the high-speed chase prior to the defendant's arrest. The court found that such evidence was admissible as "proof establishing larceny of the automobile as an aggravating circumstance." *Id.* Third, the defendant challenged testimony which alleged that while he was being held following arrest, he had removed parts of a garbage can and hid them near his cell, and had told a jailor that he intended to use the parts to kill a guard. The court ruled that such testimony was admissible at sentencing because it was related to mitigating circumstances raised by the defendant. The court reasoned that because the "defendant introduced expert evidence and institutional records to convey to the jury that he was laboring under a psychological condition which created an extreme mental or emotional disturbance at the time he committed the murder," the State was permitted to introduce rebutting evidence, "including proof of bad institutional behavior, to demonstrate that he was a person who would turn to violence in an effort to obtain his way, rather than a person who committed violent acts because he was under the influence of extreme mental or emotional disturbance." *Id.* at 880.

Under the American Bar Association guidelines for appointed death penalty defense counsel, "[t]he investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." American Bar Association, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases § 11.4.1.c (1989). We agree, therefore, with the district court's conclusions that defense counsel made no investigation into Carter's family, social or psychological background and that the failure to do so constituted representation at a level below an objective standard of reasonableness.

The second *Strickland* factor instructs this Court to consider whether Carter suffered any prejudice as a result of the absence of such mitigating factors being explained to the jury. *See Strickland,* 466 U.S. at 687. Carter must demonstrate that "counsel's errors were serious enough to deprive [him] of a proceeding the result of which was reliable." *Glenn v. Tate*, 71 F.3d 1204, 1210 (6th Cir. 1996) (finding prejudice to be "quite clear" when counsel failed to present pertinent evidence of mental history and mental capacity). The district court concluded that Carter failed to satisfy this second prong, reasoning that the introduction of mitigation evidence by a capital defendant would open the door to rebuttal evidence of Carter's extensive criminal background and violent history which would negate any mitigating factors offered.

Carter asserts that none of the proposed bad character evidence explains or controverts the specific nonstatutory mitigating circumstances, and therefore would not have been admissible to rebut the missing mitigating evidence. Respondents contend that Carter did not suffer prejudice from the deficiencies in his trial counsel's performance because the evidence adduced at the evidentiary hearing included negative material that would have been harmful rather than helpful to Carter, and because cross-examination on the evidence would have exposed Carter's past crimes and violence.

Former section 39-2-203(c) of the Tennessee Code provides the applicable standards for the admissibility of evidence in Carter's sentencing hearing. It states that "evidence may be presented as to any matter that the court deems relevant to the punishment" and may include that "evidence tending to . . . rebut mitigating factors." Tenn. Code Ann. § 39-2-203(c) (1982) (now Tenn. Code Ann. § 39-13-204(c) (Supp. 1996)). The Code permits that "evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence," and notes that "the defendant [must be] accorded a fair opportunity to rebut any hearsay statements." *Id.* Further, evidence may not be introduced at sentencing "in violation of the constitution of the United States or the constitution of Tennessee." *Id.*

The Tennessee Supreme Court has rejected an interpretation of § 39-2-203(c) which would permit the introduction of any evidence relevant to punishment regardless of the evidence's relevancy to the existence of aggravating circumstances or mitigating factors. *See Cozzolino v. State*, 584 S.W.2d 765, 767-68 (Tenn. 1979). In *Cozzolino*, the court observed that although "[o]n its face, section (c) would seem to permit the introduction of evidence 'relevant to the punishment' in addition to that 'tending to establish or rebut the aggravating circumstances' or 'tending to establish or rebut any mitigating factors. . . . this interpretation is one that we cannot accept." *Id.* at 767-68. The court continued to state that upon consideration of the entire statute:

it is clear that the only issues that the jury may properly consider in reaching a decision on the sentence to be imposed are whether the State has established one or more of the aggravating circumstances beyond a reasonable doubt, and, if so, whether any mitigating factors have been shown that would outweigh those aggravating circumstances. Any evidence that does not go to the proof of one or the other of those issues is irrelevant to the jury's deliberation.

*Id.* at 768. Therefore, under Tennessee law, "[e]vidence is relevant to punishment only if it is relevant to a statutory aggravating circumstance or to a mitigating factor raised by the defendant." *State v. Teague*, 645 S.W.2d 392, 399 (Tenn. 1983).

In *Cozzolino*, the defendant was sentenced to death for the murder of a police officer in a sentencing hearing where the State was permitted to introduce evidence establishing that the defendant had committed several armed robberies after the murder but before his capture by police. 584 S.W.2d at 767. Remanding the case for a new sentencing hearing, the Tennessee Supreme Court found that:

evidence of subsequent crimes was not admissible to establish any of the aggravating circumstances . . . , for it is relevant to none of them. . . . From the limitations placed on the use of this evidence in the court's instructions, it appears that the trial judge permitted its introduction on the theory that it was relevant to rebut evidence of mitigating circumstances that might be advanced by the defendant. In this, he was in error. "Rebutting evidence" is that which tends to explain or controvert evidence produced by an adverse party. One cannot rebut a proposition that has not been advanced. While this error admittedly might have been made harmless by the later introduction by the defendant of evidence to which the State's proof of subsequent crimes was relevant in rebuttal, that did not occur in the instant case. *The defendant's proof was limited to an attempt to show the origin, in a troubled childhood, of the defendant's criminal acts. This proof was not controverted by the State's demonstration of his present criminal proclivities.*

*Id.* at 768 (citations omitted)(emphasis added). We find that *Cozzolino* requires the State to show that its negative evidence was relevant *to a mitigating factor* actually presented by Carter, and not that it was relevant solely to punishment.